Filed 7/24/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>GLEISTON PORCINODE ANDRADE,<br><br>     Defendant and Appellant. | A135438<br><br>(Alameda County<br>Super. Ct. No. C163011) |

A jury convicted defendant Gleiston Porcinode Andrade of six counts of forcible oral copulation (Pen. Code,[1] § 288a, subd. (c)(2)) and seven counts of forcible rape (§ 261, subd. (a)(2)).  The jury also found true the allegation that defendant had committed the offenses against multiple victims.  (§ 667.61, subd. (e)(4).)  The trial court sentenced defendant to an aggregate term of 195 years to life in state prison, comprised of 13 consecutive terms of 15 years to life.  On appeal, defendant raises a plethora of evidentiary and instructional errors, as well as sentencing error.  We affirm.

## I. EVIDENCE AT TRIAL

### A.  *Rape of Jane Doe I*

On April 17, 2009, 20-year-old Jane Doe I had been visiting with her sister at a friend's house in Oakland.  When it was time for Jane Doe I's sister to go back home to Sacramento, she dropped Jane Doe I off near the Fruitvale Bay Area Rapid Transit (BART) station.  Jane Doe I admitted that she had done some prostituting, but testified that she was not working that night.  As Jane Doe I was walking to the station, she saw a black two-door Mercedes drive by in the opposite direction.  The car parked, and a man,

---

[1]     All further undesignated statutory references are to the Penal Code.

later identified as appellant, got out and began walking behind her. Appellant soon caught up with her, grabbed her arm, and put a gun in her back. He told Jane Doe I not to say anything, pulled her back to the Mercedes, and put her in the passenger seat. Once in the car, appellant pointed the gun at Jane Doe I's leg. Then he started to drive, stopping at two places, but moving on again, apparently uncomfortable with the amount of lighting in those areas. At some point, Jane Doe I asked appellant why he was doing this, and appellant struck her in the face. Eventually, after crossing High Street, he turned onto Tidewater Street and stopped in an industrial area. He demanded that Jane Doe I perform oral sex on him. He used a condom. Eventually, he said that was enough, climbed over to the passenger side, pulled off Jane Doe I's shorts and underwear, and began having vaginal intercourse with her. At one point, he said he could not feel anything, so he took off the condom, and then put his penis back in Jane Doe I's vagina. Appellant ejaculated into a napkin, which he threw out the window, along with the condom.

Appellant then drove the car to an alley. Appellant told Jane Doe I that he used to work for the Oakland Police Department, and that he would find her if she told anyone. He told her to get out of the car. Jane Doe I began walking towards the BART station in a daze. Some passers-by came to her aid and drove her to Highland Hospital, where she was examined.

Lauri Paolinetti, a physician's assistant at Highland Hospital, testified as an expert in sexual assault examinations. She performed a sexual assault exam on Jane Doe I around 2:25 a.m. on April 18. Jane Doe I complained of mouth pain, and she had bruising and tenderness on her arms. There was also an abrasion to her right upper lip and bruising on her neck. Paolinetti noticed an injury to Jane Doe I's posterior fourchette, which she explained was the most commonly injured area in sexual assault cases. Paolinetti collected oral, vaginal, and rectal swabs from Jane Doe I, as well as the clothing she was wearing.

Oakland Police Department Officer Michael Stolzman took Jane Doe I's statement at the hospital. Afterwards, he used her description to find the location he believed was

2

the scene of her rape, which was a "very industrial street with just commercial buildings; no retail shops." However, he was unable to locate any evidence there.

Investigators showed Jane Doe I photo lineups on three occasions. In the first two lineups, which occurred April 29 and 30, Jane Doe I did not recognize any suspects. In the third lineup, which Jane Doe I saw on October 28, she identified appellant as the man who raped her.

**B.     *Rape of Jane Doe II***

On the evening of April 19, 2009, 16-year old Jane Doe II was working as a prostitute near 46th Avenue and International Boulevard in Oakland. She saw a "bluish . . . Toyota or [] Chevrolet" truck pull up. Jane Doe II got in and noticed that the interior was leather, with bench-style seating in the front. She asked the driver, later identified as appellant, whether he was an undercover officer, and appellant responded that he was not. Jane Doe II did not have a condom with her and asked to get one. Appellant drove her to a liquor store, where Jane Doe II purchased a condom.

Appellant then drove Jane Doe II down High Street, saying he knew of a "little place" where they could park that was "comfortable." He drove through a place with "nothing but a bunch of trucks and then just trees and dirt," eventually stopping in an isolated area   Jane Doe II asked for the money. Appellant reached underneath his seat and pulled out a black gun, then pointed it at Jane Doe II's head. Jane Doe II panicked but could not open her door. Appellant told her to take her clothes off. He demanded that Jane Doe II perform oral sex on him, and Jane Doe II complied. Appellant was wearing a condom. Appellant then got on top of her and had vaginal intercourse with her. Eventually, he took the condom off and told her he had not finished. He placed his penis in Jane Doe II's mouth, then her vagina, then her mouth again, where he ejaculated. He threw the condom out the window.

As appellant began to drive Jane Doe II back to where he had picked her up, he said, " 'I do this to a lot of the girls. . . . I take them back there.' " When Jane Doe II got out of the truck, appellant told her, " 'No matter who you run to or tell, I don't exist.' "

3

Jane Doe II went to a gas station, where a lady let her use her phone and drove Jane Doe II home. Later, Jane Doe II went to the hospital.

Denae Reed, a physician's assistant at Highland Hospital, performed a sexual assault exam on Jane Doe II. Reed testified as an expert on such exams. Using a special dye, Reed opined that Jane Doe II had sustained a minor injury to her posterior fourchette. Reed collected swabs and Jane Doe II's clothing.

Oakland Police Department Officer David Mathison took Jane Doe II's statement. He went to the location that Jane Doe II had described, which was the 4300 block of Tidewater Street. He was unable to locate a condom. Later, Jane Doe II was shown four photo lineups. She did not identify anyone in the first two. In the third, she identified an individual who looked similar to her rapist, but she said that it was not him. In the fourth lineup on October 30, 2009, she identified a picture of appellant as her rapist. She cried and shook as she made the identification.

## C. Rape of Jane Doe III

On July 6, 2009, 25-year-old Jane Doe III was in Oakland hanging out with her friends. Later that evening, while she was alone and waiting for a ride on a side street near International Boulevard, she saw a small, light-colored, two-door car, possibly a Honda or Toyota pull up nearby. The driver and sole occupant of the car, later identified as appellant, asked if Jane Doe III "ha[d] anything." Jane Doe III believed he was asking for drugs. Jane Doe III was carrying about $10 worth of crack cocaine. As she and appellant were talking, they saw some police officers pass nearby. Appellant told her to get in the car, and Jane Doe III complied.

Once Jane Doe III was inside the car, she agreed to sell appellant crack cocaine, and she asked to see the money. Appellant reached towards the driver's side door and drew a black gun, which he pointed at Jane Doe III's stomach. Scared, Jane Doe III threw the drugs on his lap. Appellant told her to look forward and he began driving. During the drive, he told Jane Doe III he was a police officer. At one point, he spoke into a walkie-talkie. He showed Jane Doe III a silver badge. Jane Doe III noticed a FasTrak device in the middle of the front windshield.

4

Appellant parked the car in an industrial area near High Street. He told Jane Doe III to pull her pants down, and he threatened to kill her if she did not cooperate. Jane Doe III complied, and appellant pulled his own pants down. Appellant was wearing a condom and demanded that she perform oral sex on him. Jane Doe III was crying so hard that she was unable to do as she was commanded. Appellant then told Jane Doe III to get on her hands and knees; he got behind her in the passenger seat, and began having vaginal intercourse with her. When appellant was finished, he told Jane Doe III to put her clothes on and he threw the condom out the door.

Appellant drove Jane Doe III a short distance, then made a u-turn and stopped the car. He told her to get out and run the opposite direction that the car was facing. He had taken Jane Doe III's phone from her at some point, and returned it after wiping off his fingerprints with his shirt. Jane Doe III ran to a nearby McDonalds, where someone let her use their phone to call her friend, as Jane Doe III's cell phone battery had gone dead. Jane Doe III did not call 911 because she believed appellant was a police officer. Jane Doe III's friend picked her up and drove her to a family member's house in Richmond. Later that night, she went to the hospital.

Martin Moran, a physician's assistant at Highland Hospital, testified as an expert in sexual assault examinations. He performed a sexual assault exam on Jane Doe III on July 7, around 3:45 a.m. Jane Doe III complained of vaginal pain, and Moran noticed an injury to her posterior fourchette, which he said was the most commonly injured area in sexual assault cases.

Oakland Police Department Officer Dometrius Fowler took Jane Doe III's statement at the hospital. Afterwards, he used Jane Doe III's description to find a location that he believed was the scene of her rape. However, he was unable to locate any evidence at that location.

Jane Doe III was shown two photo lineups. In the first, she did not recognize anyone. In the second, she became visibly upset, started crying, and identified appellant as the man who had raped her.

5

### D.     Rape of Jane Doe IV [2]

On September 11, 2009, 15-year-old Jane Doe IV was working as a prostitute near 19th Avenue and International Boulevard, when she saw a "tannish" Toyota Corolla pull up. Jane Doe IV had met the driver, later identified as appellant, a year earlier, when he claimed to be an undercover officer and did not pay her. Jane Doe IV and appellant agreed on a deal for "[a] blow job and sex."

Jane Doe IV got into the car and appellant drove to an alley off of "East 23rd." There, he pulled out a gun, pointed it at Jane Doe IV's chest, and told her to pull her pants down. He told her that as long as she did what he wanted, he would not hurt her. Jane Doe IV put a condom on appellant and performed oral sex while crying. Eventually, appellant climbed on top of Jane Doe IV and began having vaginal intercourse with her. When he was finished, he sat back in the driver's seat and took the condom off. Appellant said he was an undercover police officer. He told Jane Doe IV that he would drive her back, but if he caught her again, he would take her to jail. Jane Doe IV got out and went home. About a month later, she reported the rape and gave a statement to the police.

Some time after making her report, Jane Doe IV saw appellant again. He was driving a blue Chevrolet pickup truck near 17th Avenue and International Boulevard. Jane Doe IV called the officer who had taken her statement and told him about the sighting. Later, she identified appellant out of a photo lineup as "the guy that raped me, and pretended to be a police officer."

### E.     Rape of Jane Doe V

In the early morning of September 12, 2009, 22-year-old Jane Doe V was working as a prostitute near 21st Avenue and International Boulevard, when she saw a small, light-colored car, possibly a Honda approach. Jane Doe V recognized the driver, later identified as appellant, as a man she had unsuccessfully negotiated with on a prior

---

[2]     Jane Doe IV's preliminary hearing testimony was read to the jury.

occasion. Jane Doe V got in the car and agreed to perform sexual acts for money. They drove off to find a suitable location, eventually stopping near a garage.

Appellant then reached over and locked Jane Doe V's door. He pulled a gun from the driver's side door and pointed it at Jane Doe V's head. Jane Doe V was frightened and crying, but appellant told her that he would not do anything to her if she cooperated. Jane Doe V put a condom on appellant and performed oral sex on him. Eventually, appellant stopped her, climbed into her seat, and began having vaginal intercourse with her. After approximately 10 minutes, appellant got off of Jane Doe V. He threw the condom out the window. He told Jane Doe V to get out and walk away; he backed the car away.

Jane Doe V called 911 and reported her rape. She then stayed at the scene until police arrived, and she directed them to the condom on the ground. Jane Doe V then went to Highland Hospital, where she submitted to a sexual assault exam. Saloni Patel, a physician assistant at Highland Hospital, testified as an expert in sexual assault exams. Although she did not observe any injuries, she explained that this was "very common."

When shown a photo lineup, Jane Doe V immediately pointed to appellant's picture and identified him as her rapist.

### F.    *Police Investigation*

Around 8:50 p.m. on October 26, 2009, Emeryville Police Department Officer Edward Mayorga responded to 6701 Shellmound Street in Emeryville. There, he saw another officer's car parked behind a blue Chevy pickup truck. Officer Mayorga ordered the driver out of the car and placed him in his patrol car. The driver was identified as appellant. Underneath the driver's seat of the truck, Officer Mayorga saw what looked like a semi-automatic, black and silver pistol. The weapon was actually a BB gun.

Oakland Police Department Officer Carlos Gonzalez had been investigating Jane Doe III's, Jane Doe IV's, and Jane Doe V's cases, and assisting with the other similar cases. When he learned of the circumstances of appellant's arrest, he instructed other officers to distribute a new photo lineup, including appellant's picture, to the victims.

7

On October 27, Officer Gonzalez supervised the execution of a search warrant at appellant's home. There, officers found a small Toyota Corolla parked in front of the home, with a FasTrak device on the front windshield. Inside the car was a Mercedes Benz vehicle manual and a service receipt listing a Mercedes license plate.

On October 29, Officer Gonzalez went to the Santa Rita Jail and obtained an oral swab from appellant.

Chani Sentiwany, a criminalist with the Oakland Police Department, testified as an expert "in the examination of biological evidence, DNA typing and DNA analysis." She examined the sexual assault exam kits obtained from Jane Doe III, Jane Doe I, Jane Doe V, and Jane Doe II. She was unable to identify sperm on any of the samples from Jane Doe III's kit. She was able to find sperm in Jane Doe I's kit, but the DNA profile she extracted matched Jane Doe I's consensual sexual partner. She also found sperm on Jane Doe V's underwear, but was unable to extract a DNA profile from the minimal sample. Sentiwany also found sperm on Jane Doe II's oral swabs, and appellant's DNA was a 1-in-89-billion match. Finally, Sentiwany examined the condom recovered from Jane Doe V's rape, and appellant's DNA was a 1-in-96-sextillion match.

Mona Madaio was an investigator with the Department of Motor Vehicles (DMV). Oakland Police Department Officer Bryant Ocampo had asked the DMV to investigate the Mercedes information recovered from appellant's Corolla. Madaio testified that appellant had legal possession of a 2003 Mercedes sport coupe from June 20, 2007, until June 1, 2009.

## II. DISCUSSION

A. *Exclusion of Evidence Other Cases*

Appellant contends the trial court erred in excluding evidence of similar open cases and by limiting cross-examination on this topic. He further claims the trial court erred in denying his new trial motion based on this alleged error and that his due process rights were violated.

### 1. Background

Prior to trial, the prosecution moved to exclude evidence of third party culpability absent an offer of proof. The trial court granted the motion. During trial, the prosecution elicited information from police witnesses about other suspects who were ultimately excluded after further investigation. The defense was permitted to cross-examine these witnesses regarding those eliminated suspects. The defense, however, was not permitted to cross-examine the witnesses about the possibility of other "police poser rape cases."

During the prosecution's case, the defense requested permission to cross-examine Officer Gonzalez "with reference to some other police reports . . . in an effort to establish third party culpability." Defense counsel had the reports, but had not yet reviewed them to determine if she would raise the issue on cross-examination. Without ruling on the issue, the court noted that "there must be some direct or circumstantial evidence connecting a third person to the actual perpetration of the crime . . . [Case law] suggests that that must be a known person. In other words, you can't for instance, show that other people might have had the same motive . . . ."

After the close of evidence, the defense placed on the record that the court had ruled in chambers that the defense could not cross-examine police witnesses about two particular police reports. The court responded with its reasoning for the ruling, explaining that "since there was no evidence that there was a known suspect [in those cases], . . . cross-examination on the matter would not be relevant."

The defense reasserted the issue in its motion for a new trial. In its motion, the defense identified four police reports describing rapes under circumstances similar to those of the victims in appellant's case. Each case involved an African-American female prostitute picked up on or near International Boulevard, threatened with a firearm, and raped. In some cases, the assailant would claim involvement with law enforcement, force the victim to orally copulate him, or take the victim to an area near High Street and Tidewater Street. In each case, the description of the assailant and his vehicle were similar to that of appellant and one of his vehicles. In each case, the victim did not

9

identify appellant as the attacker. In one case, recovered DNA evidence did not match appellant.

The trial court denied the new trial motion, explaining that the challenged cross-examination would have been hearsay to the extent the defense would have tried to introduce evidence that those victims had not identified appellant, or that DNA evidence cleared him in one of the cases. The court also noted "there is no link to a known suspect." Finally, the trial court explained that allowing the cross-examination may have opened the door to the prosecution presenting additional evidence on those cases, taking "substantial additional time."

2. *Analysis*

Appellant argues that the trial court erred by prohibiting cross-examination about the possibility of other "police poser rape cases." We disagree.

" ' "[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt . . . must link the third person either directly or circumstantially to the actual perpetration of the crime." ' (*People v. Elliott* (2012) 53 Cal.4th 535, 580.) 'For evidence of an uncharged offense to be admissible to establish the third party's identity as the perpetrator of the charged crimes, " '[t]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' " [Citations.] A large number of common marks may, when viewed in combination, establish the required distinctive pattern.' (*Id.* at p. 581; see *People v. Page* (2008) 44 Cal.4th 1, 39 [right to present all evidence of a significant probative value is not 'inconsistent with the rule . . . that third party culpability evidence is admissible only if it links a third party to the crime'].)" (*People v. Suff* (2014) 58 Cal.4th 1013, 1063.) "A trial court's ruling excluding third party culpability evidence is reviewed for abuse of discretion." (*People v. Elliott, supra,* 53 Cal.4th at p. 581.) There was no abuse of discretion here.

The proffered evidence that, after appellant was arrested, prostitutes continued to be raped at gun point, by individuals claiming to be law enforcement officers, does not establish a link between a third person and the crimes charged against appellant. "None

10

of these shared characteristics is unusual or distinctive . . . [P]rostitutes are vulnerable and tend to be victimized. (See, e.g., *People v. Jones* (2013) 57 Cal.4th 899 [two and perhaps three homicide victims were prostitutes, and the three had been left in dumpsters]; *People v. Solomon* (2010) 49 Cal.4th 792, 798 [six drug-abusing prostitutes murdered]; *People v. Doolin* (2009) 45 Cal.4th 390, 400, [defendant murdered two prostitutes and attempted to murder four more prostitutes]; *People v. Rogers* (2006) 39 Cal.4th 826, 835 [two prostitutes murdered]; see also *People v. Jennings* [(1991)] 53 Cal.3d at p. 363 [noting that prostitutes 'could be seen as especially vulnerable'].)" (*People v. Suff, supra,* 58 Cal.4th at pp. 1063-1064.) Moreover, the use of guns by individuals posing as law enforcement officers is similarly unremarkable. Indeed, defense counsel argued below that the circumstances of the charged offenses and the uncharged offenses were "not unique in the least," and were "so common that the Oakland Police Department ha[d] a 9[-]page document entitled 'Rapists Posing as Law Enforcement.' "[3]

We next consider whether the evidence was admissible to prove the bare fact that the rapes of prostitutes did not end with appellant's arrest. Appellant asserts that the prosecutor, by arguing that "there were no similar attacks after appellant's arrest" and by suggesting the charged attacks were "distinctive in MO" erroneously caused the jury to believe he was guilty despite the fact that "there were in fact dozens of similar open cases." Therefore, he contends, the evidence of post-arrest rapes was relevant to rebut the prosecutor's argument that appellant was guilty based on the "doctrine of chances" and pattern of the rapes.

The prosecutor's theory was not based on the fact that the victims were all prostitutes who were raped at gunpoint by an individual claiming to be a law enforcement officer. Rather, her argument relied on the repeated patterns of evidence of the charged offenses and their similarities to each other, including the location of the offenses and the sequence of the assaults. The prosecutor urged the jury not to ignore "the giant

---

[3] Appellate counsel likewise contends that this "was not a distinctive [modus operandi [(MO)] at all."

11

[e]lephant in the room of the similarities of the nearly identical nature of all of the details that are the same or similar in this case." Moreover, contrary to appellant's contention, the prosecutor did not argue that his guilt could be based on the "doctrine of chances." Rather, the prosecutor argued that the circumstances of the rapes of the five young women were similar to each other, not that they represented such distinctive assaults that there was no other way to explain how "so many victims . . . would identify appellant." Accordingly, the trial could did not abuse its discretion in limiting cross-examination and/or precluding evidence regarding the proffered third-party culpability theory.

Similarly, the trial court did not abuse its discretion in denying appellant's new trial motion based on the exclusion of third-party culpability evidence. (See *People v. Homick* (2012) 55 Cal.4th 816, 894.)

Finally, inasmuch as the trial court's ruling did not constitute an abuse of discretion under Evidence Code section 352, appellant's constitutional claims fail on the merits. Barring rare circumstances not present here, "application of the ordinary rules of evidence under state law does not violate a criminal defendant's federal constitutional right to present a defense, because trial courts retain the intrinsic power under state law to exercise discretion to control the admission of evidence at trial." (*People v. Abilez* (2007) 41 Cal.4th 472, 503; *People v. Snow* (2003) 30 Cal.4th 43, 90 ["Application of the ordinary rules of evidence, such as Evidence Code section 352, generally does not deprive the defendant of the opportunity to present a defense"].)

**B.**     *Admission of Preliminary Hearing Testimony of Jane Doe IV*

Appellant contends that admission of Jane Doe IV's preliminary hearing testimony deprived him of his constitutional rights to confrontation and due process. According to appellant, the trial court erred in admitting this testimony because: 1) the prosecution failed to exercise due diligence in securing this witness's attendance at trial; and 2) appellant lacked an adequate opportunity for cross-examination at the preliminary hearing.

*1.     Background*

Jane Doe IV was not available at the time of trial, although she had testified at appellant's preliminary hearing on February 23, 2010. The trial court conducted a hearing on the prosecution's efforts to procure Jane Doe IV's appearance at trial. The prosecution presented the testimony of two witnesses detailing the efforts to locate Jane Doe IV.

Inspector Stephanie England testified that prior to the preliminary hearing, she had spoken with Jane Doe IV by calling the phone number provided on the police report. In December 2009, she met with Jane Doe IV in Oakland at Jane Doe IV's boyfriend's sister's house. England had the phone numbers for Jane Doe IV, Jane Doe IV's boyfriend, and Jane Doe IV's grandmother's boyfriend. Jane Doe IV testified at appellant's preliminary hearing without issue.

However, after the preliminary hearing, Jane Doe IV's phone number was no longer in service. Jane Doe IV, a juvenile at the time, had no reliable, known address. England ran Jane Doe IV's criminal history, checked for a California Driver's License or identification card, and called all of the phone numbers she had, all to no avail. England was unable to find addresses for Jane Doe IV's parents, grandparents, or boyfriend. In August 2011, she handed the case off to another investigator, Inspector Lux, who had requested police reports from the El Cerrito Police Department related to Jane Doe IV's grandmother and the grandmother's boyfriend.

In November 2011, Inspector Harry Hu took over for Inspector Lux. Hu left a message at the phone number given for Jane Doe IV's grandmother's boyfriend in the El

Cerrito police reports, but received no response. Hu checked local, state, and federal law enforcement databases for Jane Doe IV, but found nothing. He also looked for information on Jane Doe IV's family in those databases, but again found nothing. He tried calling all of the phone numbers related to Jane Doe IV, but they were either disconnected or not receiving calls. He sent messages to Jane Doe IV on the Facebook and Myspace Web sites, but did not receive an answer. On Jane Doe IV's Facebook account, she listed "Ray Hale" as her husband. Hu tracked down an address for two men named "Ray Hale" (father and son) in Richmond. He went there and spoke to them, but they did not know Jane Doe IV. He checked whether Jane Doe IV had received a driver's license or identification card, owned a car, or had an adult criminal history, all without result. He ran her name through a "people-search database" without result. When he ran her family's names through the database, he obtained phone numbers, but they were either disconnected or did not answer. Hu also checked whether Jane Doe IV was in a local hospital, but found nothing. He had run checks on Jane Doe IV's given name, Jane Doe IV with her mother's last name, and Jane Doe IV with Hale's last name, and found nothing. Hu had tried all of the contact information again on the day of hearing.

Hu acknowledged that he had an address for Jane Doe IV's grandmother but had not gone there. He also had Jane Doe IV's mother's last known address in San Francisco, but had not gone there either.

Defense counsel argued that the prosecution had not shown due diligence in attempting to bring Jane Doe IV to court. Defense counsel also argued that counsel did not have the same opportunity or motive to cross-examine Jane Doe IV at the preliminary hearing, since the purpose of the preliminary hearing was simply to show probable cause, and the defense attorney at that hearing had not previously met with appellant. The trial court disagreed and found that the prosecution had exercised due diligence and that the defense had a sufficiently similar motive and opportunity to cross-examine Jane Doe IV at the preliminary hearing.

14

## 2. *Applicable Law*

Under the state and federal Constitutions, a criminal defendant has the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Herrera* (2010) 49 Cal.4th 613, 620 (*Herrera*).) "Although important, the constitutional right of confrontation is not absolute. [Citations.]" (*Id.* at p. 621; accord, *People v. Thomas* (2011) 51 Cal.4th 449, 499.) An exception exists when a witness is unavailable, the witness testified against the defendant at a prior proceeding, and the witness was subjected to cross-examination. (Evid.Code, § 1291, subd. (a)(2); *Herrera, supra,* 49 Cal.4th at p. 621.) A witness is unavailable if the prosecution "has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid.Code, § 240, subd. (a)(5).)

On appeal, "[w]e review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard [citation], and independently review whether the facts demonstrate prosecutorial good faith and due diligence [citation]." (*Herrera, supra,* 49 Cal.4th at p. 623.)

## 3. *Unavailability*

"A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial. [Citation.] The United States Supreme Court has described the good faith requirement this way: 'The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness. [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.' [Citation.]" (*Herrera, supra,* 49 Cal.4th at p. 622.)

15

This good faith obligation is reflected in the language of Evidence Code section 240, subdivision (a)(5), which states that a witness is unavailable when he or she is " '[a]bsent from the hearing and the proponent of his or her statement has exercised *reasonable diligence* but has been unable to procure his or her attendance by the court's process.' (Italics added.) The term '[r]easonable diligence, often called "due diligence" in case law, " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' [Citations.]" (*Herrera, supra,* 49 Cal.4th at p. 622.) The due diligence requirement imposed by California law is essentially the same as the federal constitutional good faith requirement. (*Ibid.*)

"Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citation.]" (*Herrera, supra,* at p. 622; *Valencia, supra,* at p. 292.) As long as " 'substantial good faith' " efforts are undertaken to locate a witness, the fact that " 'additional efforts might have been made or other lines of inquiry pursued' " does not indicate lack of diligence because " '[t]he law requires only reasonable efforts, not prescient perfection.' [Citation.]" (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)

Appellant contends the evidence summarized above does not support the trial court's finding that Jane Doe IV was unavailable because the prosecution failed to establish that it exercised due diligence to secure Jane Doe IV's attendance at trial. We disagree.

"[D]iligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period. [Citations.]" (*People v. Bunyard* (2009) 45 Cal.4th 836, 856.) In contrast, diligence has found to be lacking where the prosecution's efforts were "perfunctory or obviously negligent. [Citations.]" (*Id.* at p. 855.)

Appellant acknowledges that the efforts of the investigators in "terms of contact information checks, telephone numbers, and [] email" appeared to be "substantial." Nevertheless, he faults the investigators' work in tracking down Jane Doe IV because

"there was no subpoena" issued when "it became clear [that Jane Doe IV] and her . . . contacts were not being responsive." Under these circumstances, appellant argues that there should have been "physical checks" of the known "prominent physical addresses (a grandmother, the grandmother's boyfriend, and [Jane Doe IV's] mother) . . . ."

Preliminarily, appellant fails to explain how a subpoena would have any greater efficacy in keeping Jane Doe IV on the prosecutor's radar screen. As discussed, Jane Doe IV was a juvenile prostitute with no fixed home, who appeared without incident at the preliminary hearing. "The prosecution is not required 'to keep "periodic tabs" on every material witness in a criminal case . . . .' [Citation.] Also, the prosecution is not required, absent knowledge of a 'substantial risk that this important witness would flee,' to 'take adequate preventative measures' to stop the witness from disappearing." (*People v. Wilson* (2005) 36 Cal.4th 309, 342.)

Prior to trial, the investigators explored various avenues in attempting to locate her; making numerous calls to Jane Doe IV and her family; checking multiple statewide databases for Jane Doe IV and her family; attempting to contact Jane Doe IV on social media Web sites; following up on a possible spouse; and even checking local hospitals. Exercising our independent review, we conclude the prosecution's efforts to produce Jane Doe IV for trial were reasonable under the circumstances. (See *People v. Wilson, supra,* 36 Cal.4th 309, 342.) That the investigators failed to conduct "physical checks" at the last known addresses for the grandmother and her boyfriend, and for Jane Doe IV's mother does not transform this otherwise exhaustive effort into an unreasonable one, lacking the requisite diligence. The situation here is the same as repeatedly confronted by our Supreme Court: "[D]efendant has suggested other things the prosecution might have done. But these suggestions do 'not change our conclusion that the prosecution exercised reasonable diligence. "That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness." ' " (*Valencia, supra,* 43 Cal.4th at p. 293, quoting *People v. Wilson, supra,* 36 Cal.4th 309, 342.)

17

Accordingly, we conclude that the prosecution satisfied its good faith obligation and exercised reasonable diligence to secure Jane Doe IV's attendance at trial.

4. *Opportunity for Cross-Examination at Preliminary Hearing*

Appellant next argues that he did not have an adequate opportunity to cross-examine Jane Doe IV at the preliminary hearing because cross-examination is limited at preliminary hearings and because defense counsel did not have access to Jane Doe IV's written statement to the police.

Defense counsel was perfectly free to, and did in fact, question Jane Doe IV about her written statement to the police. That the written statement was not available at the time of the preliminary hearing did not prevent defense counsel from otherwise confronting Jane Doe IV about her accusations against appellant. "[A] prior opportunity to cross-examine a witness who has become unavailable is considered an adequate substitute for present cross-examination at trial." (*People v. Jones* (1998) 66 Cal.App.4th 760, 766.) Thus, " ' "[a]s long as a defendant was provided the opportunity for cross-examination, the admission of preliminary hearing testimony under Evidence Code section 1291 does not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective." [Citations.]' " (*People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1548, italics omitted.)

Both the United States Supreme Court and the California Supreme Court "have concluded that 'when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement [citation], regardless whether subsequent circumstances bring into question the accuracy or the completeness of the earlier testimony. [Citation.]' " (*People v. Wilson, supra,* 36 Cal.4th at p. 343.) *People v. Gonzales* (2012) 54 Cal.4th 1234, cited by the Attorney General, provides a particularly apt discussion in this regard. In *Gonzales*, defense counsel did not have a child witness's therapy records at the preliminary hearing. (*Id.* at p. 1261.) There, the record showed that before the hearing, the witness had been lying and possibly depressed

or suffering from posttraumatic stress disorder. (*Id.* at p. 1262.) Nevertheless, our supreme court concluded that defense counsel had a meaningful opportunity to cross-examine the witness, and it upheld the trial court's decision to admit the witness's former testimony at trial. (*Id.* at pp. 1264-1265.) Similarly here, appellant had a meaningful opportunity to cross-examine Jane Doe IV despite not having seen her written statement to the police. Indeed, although appellant complains that he did not have Jane Doe IV's written statement at the preliminary hearing, he has not identified any meaningful inconsistencies or material differences between her statement and her testimony to substantiate his claim of deprivation.

5.      *Constitutional Claims*

Finally, appellant argues that his claims that he was deprived of his federal constitution rights to a fair trial and to confront witnesses are cognizable on appeal, or alternatively that he received ineffective assistance of counsel if his claims were forfeited by failing to raise them below. There is no need to extend the length of this opinion by detailing the obvious. Inasmuch as we have found no error in the admission of Jane Doe IV's preliminary hearing testimony, there is nothing to support appellant's constitutional claims (state or federal) and his related ineffective assistance of counsel claim.

## C.      *Presence of Support Person*

In certain criminal cases, a prosecuting witness is entitled to the supporting attendance of two persons at trial, one of whom may accompany the witness to the witness stand. (§ 868.5, subd. (a).)

Prior to trial, the prosecutor, citing section 868.5, subdivision (a),[4] moved to allow each victim to be accompanied to the witness stand by a support person. Defense counsel

---

[4]      As pertinent here, section 868.5, subdivision (a) provides: (a) "Notwithstanding any other law, a prosecuting witness in a case involving a violation or attempted violation of Section . . . 288a, . . . shall be entitled, for support, to the attendance of up to two persons of his or her own choosing, one of whom may be a witness, at the . . . trial, . . . during the testimony of the prosecuting witness. Only one of those support persons may accompany the witness to the witness stand, although the other may remain in the courtroom during the witness' testimony."

stipulated to the use of such support persons. Accordingly, the trial court granted the motion to allow each of the victims to be accompanied to the witness stand by a support person. It appears, however, that only Jane Doe III was accompanied by a victim witness advocate. Appellant now contends that, despite his lack of objection, his Sixth Amendment right to confront witnesses was violated by the presence of the victim witness advocate during Jane Doe III's testimony because no constitutionally required inquiry on the necessity of support persons occurred. His argument is based primarily on *People v. Adams* (1993) 19 Cal.App.4th 412, 443-444 (*Adams*), which rejected a constitutional challenge to the support person statute, but held that there must be a case-by-case showing of necessity for a support person presented at an evidentiary hearing.

In *People v. Lord* (1994) 30 Cal.App.4th 1718, our colleagues in Division Five of this court held that the defendant waived the claim that he was denied a constitutional right to an evidentiary hearing on the necessity of a support person by failing to request a hearing or otherwise objecting to the presence of a support person. (*Id.* at p. 1722.) *Lord* stated that the showing required by *Adams* at such a necessity hearing is "debatable," and in dicta, suggested that the showing required under section 868.5 is that the presence of the support person " 'is both desired by the prosecuting witness for support and will be helpful to the prosecuting witness' [citations]." (*Lord, supra*, 30 Cal.App.4th at pp. 1721-1722.) In determining that the lack of a necessity hearing was waived, *Lord* stated: "The absence of an objection deprived the trial court of the opportunity to correct any procedural error and make an evidence-based finding that [the witness] needed a support person." (*Id.* at p. 1722.)

Appellant asserts that we should reject the holding in *Lord* or deem it inapplicable here because *Adams* and a case *Adams* relies upon, *Maryland v. Craig* (1990) 497 U.S. 836, suggest the trial court has a sua sponte duty to ensure that the requisite necessity exists before presence of the support person is permitted. However, in *Adams,* an objection to the procedure was made (*Adams, supra,* 19 Cal.App.4th at p. 434), and, so,

the case is not authority for a court's duty to conduct a hearing in the absence of an objection. Appellant then cites *People v. Keelin* (1955) 136 Cal.App.2d 860, 870-871, for the proposition that courts have a sua sponte duty to ensure that minimum foundational evidentiary showings are met. In *Keelin,* the appellate court concluded that the trial court erroneously admitted certain statements under the spontaneous declaration exception to the hearsay rule without sufficiently assessing whether the evidentiary foundation for those statements qualified them as spontaneous declarations. (*Id.* at pp. 868-872.) Given that the defendant had twice objected to the admission of the statements as spontaneous declarations, the *Keelin* court concluded that the defendant's failure to tender the same objection regarding other witnesses did not constitute a waiver. (*Id.* at p. 870.) Accordingly, *Keelin* is inapposite. The issue here does not concern the court's role in admitting evidence, and unlike *Keelin* there was no objection at any time by appellant.

Nevertheless, appellant argues, citing *People v. Haston* (1968) 69 Cal.2d 233, 256, footnote 28, that we should excuse his failure to object because the statute is apparently mandatory, discouraging an objection, yet the case law regarding whether a case-specific showing of necessity is required is unsettled. While it is not clear from *Adams* and *Lord* precisely what showing is required in all cases, since *Lord* was decided in 1994, there is no dispute either that the failure to object to the absence of a showing of necessity constitutes a waiver, or that the defendant may require some type of antecedent showing before a support person is allowed to accompany a witness. Moreover, while section 868.5, subdivision (b) does state that if the support person is also a prosecuting witness, the prosecutor "shall" present evidence the person's attendance is desired by, and helpful to, the complaining witness, there is nothing in the statute or case law to suggest that the prosecutor cannot be relieved of that burden where, as here, the support person is not a prosecuting witness and the defense counsel actually agrees to the support person's presence without evidence that the person's presence was desired by the victim and helpful.

Finally, appellant asks us to exercise our discretion to review the issue despite his failure to object, or alternatively to find he was denied effective assistance of counsel.

21

Even assuming for the sake of argument that appellant has preserved his claim of error, it fails on the merits. The components of the confrontation clause are "(1) the face-to-face confrontation, (2) the oath, (3) the cross-examination, and (4) the jury's observation of the witness's demeanor." (*People v. Johns* (1997) 56 Cal.App.4th 550, 554, citing *Maryland v. Craig, supra,* 497 U.S. at p. 846.) In *Maryland v. Craig,* a necessity hearing was required where the minor victim testified via a one-way closed circuit television. (*Id.* at pp. 855-857.) *Adams* required a necessity hearing where the support person was also a witness at trial and there was an allegation that the support person, who was also the victim's father, had abused the victim, which could have motivated her to report the offenses as she did. (*People v. Adams, supra,* 19 Cal.App.4th at p. 434.) Thus, the court found that a hearing was necessary because the presence of the support person potentially affected the victim's trial performance and demeanor. (*Id.* at p. 438.)

Here, the dangers addressed in *Adams* and *Maryland v. Craig* are not present. Jane Doe III testified in person, permitting face-to-face confrontation, and her support person was not a testifying witness. In addition, the record does not suggest that the presence of the support person during her testimony had any impact on the jury's perception of Jane Doe III's demeanor, or in any way influenced Jane Doe III's testimony.[5] (See *People v. Johns, supra,* 56 Cal.App.4th at pp. 555-556.) Accordingly, we conclude that no constitutional error has been demonstrated.

### D.     *Instructions Regarding Appellant's Statements*

The trial court did not instruct the jury with CALCRIM No. 358 (Evidence of Defendant's Statements) or CALCRIM No. 359 (Corpus Delicti: Independent Evidence of a Charged Crime), nor did appellant request these instructions. Appellant argues the trial court erred because it had a sua sponte duty to give these instructions. The Attorney General concedes the trial court had a sua sponte duty to instruct with both instructions, but claims the error was harmless. We agree.

---

[5] The record does not disclose support person's proximity to Jane Doe III as she testified on the witness stand.

We begin with the corpus delicti rule embodied in CALCRIM No. 359, which provides: "The defendant may not be convicted of any crime based on (his/her) out-of-court statement[s] alone. You may rely on the defendant's out-of-court statements to convict (him/her) only if you first conclude that other evidence shows that the charged crime [or a lesser included offense] was committed. . . . [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] The identity of the person who committed the crime [and the degree of the crime] . . . may be proved by the defendant's statement[s] alone. [¶] You may not convict the defendant unless the People have proved (his/her) guilt beyond a reasonable doubt."

"Whenever an accused's extrajudicial statements form part of the prosecution's evidence, the cases have additionally required the trial court to *instruct* sua sponte that a finding of guilt cannot be predicated on the statements alone. [Citations.]" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1170.) "Error in omitting a corpus delicti instruction is considered harmless, and thus no basis for reversal, if there appears no reasonable probability the jury would have reached a result more favorable to the defendant had the instruction been given. [Citations.]" (*Id.* at p. 1181.)

Here, it is not reasonably probable the jury would have reached a different result since there was more than sufficient independent evidence of the corpus delicti of the crimes. Each of the five victims testified against appellant, giving detailed accounts how the rapes occurred. The testimony of the victims was corroborated in part by the various sexual assault examiners who testified, as well by the DNA evidence, plus by the evidence from the criminal investigation, which connected appellant to the vehicles and weapon used in the crimes. This independent evidence is more than adequate to establish, as a matter of law, that the failure to give the instruction was harmless under state and federal standards. (*People v. Alvarez, supra,* 27 Cal.4th at p. 1181; *People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

CALCRIM No. 358, on the other hand, would have provided some benefit to appellant because it specifically informs the jury that it must consider "with caution"

23

evidence of a defendant's oral statement "unless the statement was written or otherwise recorded." Appellant argues that prejudice was inherent in the failure to give this instruction because the statements attributed to him by the victims "went directly to identification based on supposedly similar MOs, as well as lack of consent." Appellant argues that CALCRIM No. 358 would have provided "some instructional guidance highlighting the fact reported statements are as easily fabricated or mistaken . . . ."

We are not convinced a different result would have been reached had the jury been properly instructed. The issue of witness believability was squarely before the jury. The trial court instructed the jury with CALCRIM No. 226, which sets forth the factors in assessing the credibility and believability of witnesses. Considering the detailed account of the five victims and the ample, independent corroborating evidence of appellant's guilt, it is not reasonably probable that appellant would have obtained a better result if CALCRIM No. 358 had been given. (*People v. Watson, supra,* 46 Cal.2d at p. 836.) Moreover, on this record, any error in failing to give this instruction was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

Finally, we reject appellant's claim that the aforementioned harmless errors violated his rights to due process and a fair trial. As our Supreme Court explained in *People v. Dickey* (2005) 35 Cal.4th 884, 905 " '[m]ere instructional error under state law regarding how the jury should consider evidence does not violate the United States Constitution,' " nor does " '[f]ailure to give the cautionary instruction . . . make the trial fundamentally unfair.' "

## E.    *Defense of Consent Instruction*

Appellant next argues that the trial court had a sua sponte duty to instruct the jury, pursuant to *People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*), that it should find appellant not guilty if he held a reasonable and good faith but mistaken belief that his victims consented to engage in sexual intercourse. We disagree.

"In the absence of a request for a particular instruction, a trial court's obligation to instruct on a particular defense arises ' "only if [1] it appears that the defendant is relying on such a defense, or [2] if there is substantial evidence supportive of such a defense and

24

the defense is not inconsistent with the defendant's theory of the case." ' [Citations.]" (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148 [defendant not entitled to *Mayberry* instruction].) Here, appellant satisfies neither prong of this test. The defense did not claim that appellant reasonably believed the victims had consented, and did not request a *Mayberry* instruction or object to its omission. Rather, the defense focused on identification issues. Appellant claims on appeal that defense counsel also raised "reasonable doubt issues regarding [the] consent as to some victims." Appellant insists that a *Mayberry* instruction "was fully consistent with [his] identification defense, coupled with alternate arguments about actual consent . . . ." Appellant, however, points to nothing suggesting that he relied on the belief-as-to-consent defense at trial, rather he points to evidence that might have supported a theory of actual consent, i.e. prostitution negotiations, use of condoms, and in the case of Jane Doe IV—a possible motive for lying based on prior transaction where appellant allegedly "stiffed or shorted" her on money. In sum, appellant did not rely on a *Mayberry* defense at trial. (*People v. Dominguez, supra,* 39 Cal.4th at p. 1148.)

As for the second prong of the test, there was no substantial evidence supporting a *Mayberry* defense. (*People v. Dominguez, supra,* 39 Cal.4th at p. 1148.) A *Mayberry* instruction "should not be given absent substantial evidence of equivocal conduct that would have led defendant to reasonably and in good faith believe consent existed where it did not." (*People v. Williams* (1992) 4 Cal.4th 354, 362.) In *Williams,* appellant testified that the victim initiated sexual contact and willingly had intercourse with him, testimony which, if believed, established actual consent. (*Ibid.*) The victim testified that appellant raped her after he prevented her from leaving a hotel room, punched her in the eye, pushed her onto the bed, and ordered her to disrobe. (*Id.* at pp. 360, 362.) The *Williams* court concluded that there was no substantial evidence of equivocal conduct warranting a *Mayberry* instruction, because the "wholly divergent accounts create no middle ground from which [appellant] could argue he reasonably misinterpreted [the victim's] conduct." (*Williams, supra,* 4 Cal.4th at p. 362.)

25

The *Mayberry* defense has both a subjective and an objective component. (*People v. Williams, supra,* 4 Cal.4th at p. 360.) In order to satisfy the subjective component, an appellant must present evidence of the victim's equivocal conduct that showed why he had an honest and good faith, albeit mistaken, belief as to consent. (*Id.* at pp. 360-361.) In order to satisfy the objective component, the appellant must show that his mistake was reasonable under the circumstances. (*Id.* at p. 361.) "[R]egardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*Ibid.*)

In arguing that a *Mayberry* instruction was required here, appellant relies on the following passage from *Williams:* "We note for the guidance of the lower courts that there may be cases, as in *Mayberry,* in which there is evidence of equivocal conduct that could be reasonably and in good faith relied on to form a mistaken belief of consent, but also evidence that this equivocal conduct occurred only after the defendant's exercise or threat of 'force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another.' (§ 261, subd. (a)(2); [citations].) No doubt it would offend modern sensibilities to allow a defendant to assert a claim of reasonable and good faith but mistaken belief in consent based on the victim's behavior *after* the defendant had exercised or threatened 'force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another.' [Citations.] However, a trier of fact is permitted to credit some portions of a witness's testimony, and not credit others. Since a trial judge cannot predict which evidence the jury will find credible, he or she must give the *Mayberry* instruction whenever there is substantial evidence of equivocal conduct that could be reasonably and in good faith relied on to form a mistaken belief of consent, despite the alleged temporal context in which that equivocal conduct occurred. The jury should, however, be further instructed, if appropriate, that a reasonable mistake of fact may not be found if the jury finds that such equivocal conduct on the part of the victim was the product of 'force, violence, duress, menace, or fear of immediate and unlawful

26

bodily injury on the person or another.' " (*People v. Williams, supra,* 4 Cal.4th at p. 364.)

Appellant apparently contends that, even though his victims testified that he used "force, violence, duress, menace, or fear of immediate and unlawful bodily injury" (§ 261, subd. (a)(2)) against them, it was up to the jury to decide whether appellant nonetheless had a good faith but mistaken belief that they consented to sexual acts with him. A review of the relevant evidence as to each of the victims does not support this argument.

Jane Doe III testified that after she agreed to sell crack to appellant, he pulled a gun on her and threatened to kill her. She cried during her rape. At one point, Jane Doe III was crying so hard that she was unable to perform oral sex on appellant.

Jane Doe I testified that appellant grabbed her on the street, put a gun in her back, and pulled her into his car. Appellant told her not to say anything, struck her in he face, and pointed a gun at her. He held the gun to her head while she performed oral sex. Jane Doe V initially agreed to have sex with appellant in exchange for money, but then appellant pointed a gun at her head. Jane Doe V told him not to kill her and cried during her assault. Similarly, Jane Doe IV initially agreed to have sex with appellant. Jane Doe IV told appellant not to kill her, and she cried during her assault. Jane Doe II also reached an agreement with appellant, before he pointed a gun at her head. She told appellant not to hurt her and was crying.

Here, no matter what the jury could have believed about appellant's subjective understanding when Jane Doe V, Jane Doe IV, and Jane Doe II agreed to exchange sex for money, the evidence was unequivocal, and overwhelming that the consent ended when appellant pulled out his gun and threatened the victims. (See *People v. Ireland* (2010) 188 Cal.App.4th 328, 338 [any previous consent ceased once appellant used knife and threatened victims].) Moreover, with respect to the crimes committed against Jane Doe I and Jane Doe III there was no evidence suggesting there had been any agreement to have sex. Given the detailed evidence that appellant threatened each of the victims with a gun and that the young women cried and were terrified during the assaults, it is

27

inconceivable that the jury, if given a *Mayberry* instruction, would have found appellant actually believed he had their consent to the charged acts; it stretches credulity yet further to suggest the jury could have found that such a belief, even if subjectively held, was objectively reasonable. On this record any failure to give a *Mayberry* instruction was harmless under both state and federal standards. (*People v. Watson, supra,* 46 Cal.2d at p. 836; *Chapman v. California, supra,* 386 U.S. at p. 24.)

**F.     Reasonable Doubt Instructions**

Pursuant to CALCRIM No. 220, the trial court instructed the jury, in pertinent part: "Proof beyond a reasonable doubt is *proof that leaves you with an abiding conviction that the charge is true.* [¶] . . . In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially *compare and consider all the evidence that was received throughout the entire trial.* Unless the evidence prove[d] the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." (Italics added.)

Pursuant to CALCRIM No. 222, the jury was further told: "*You must decide what the facts are in this case.* You must *use only the evidence that was presented in this courtroom.* 'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence." (Italics added.)

Appellant now complains these instructions denied him due process, a fair trial, and his right to a jury determination on all issues beyond a reasonable doubt, because 1) jurors were told, in CALCRIM No. 222 and other instructions, that they had to decide the facts based solely on the evidence presented in court, whereas reasonable doubt may be based on the *absence* of evidence, and 2) the " 'abiding conviction' " language is "archaic and incomplete" and conveys "an insufficient standard of proof akin to clear and convincing evidence and going only to jurors' duration of belief in guilt, not their degree of certainty." His arguments lack merit. Numerous appellate courts have rejected the argument that CALCRIM Nos. 220 and 222 eliminate the doctrine of reasonable doubt due to lack of evidence. (See *People v. Zavala* (2008) 168 Cal.App.4th 772, 781; *People v. Flores* (2007) 153 Cal.App.4th 1088, 1091-1093; *People v. Hernández Ríos* (2007)

28

151 Cal.App.4th 1154, 1156-1157;.g., *People v. Garelick* (2008) 161 Cal.App.4th 1107, 1117–1119; *People v. Campos* (2007) 156 Cal.App.4th 1228, 1237–1238; *People v. Guerrero* (2007) 155 Cal.App.4th 1264, 1267–1269; *People v. Westbrooks* (2007) 151 Cal.App.4th 1500, 1509–1510; cf. *People v. Taylor* (2010) 48 Cal.4th 574, 631 & fn. 15 [rejecting claim CALJIC No. 2.90 failed to inform jury reasonable doubt could be based on lack of evidence].)

Likewise, the United States Supreme Court and the California Supreme Court have rejected challenges to the constitutionality of CALJIC No. 2.90, which is worded similarly to CALCRIM No. 220. (See, e.g., *Victor v. Nebraska* (1994) 511 U.S. 1, 16–17; *People v. Farley* (2009) 46 Cal.4th 1053, 1122.) In *Victor v. Nebraska, supra,* 511 U.S. at pages 14-15, the United States Supreme Court stated: "An instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, *correctly states the government's burden of proof.* [Citations.]" (Italics added.) Courts universally have rejected challenges to CALCRIM No. 220's use of the phrase "abiding conviction," including that it conflates the separate concepts of duration and weight. (See, e.g., *People v. Zepeda* (2008) 167 Cal.App.4th 25, 28-32; *People v. Garelick, supra,* 161 Cal.App.4th at p. 1119; *People v. Stone* (2008) 160 Cal.App.4th 323, 332–334; *People v. Campos, supra,* 156 Cal.App.4th at pp. 1238–1239; cf. *People v. Freeman* (1994) 8 Cal.4th 450, 504 & fn. 9 [suggesting modification of CALJIC No. 2.90 to refer to "abiding conviction" without references to " 'moral evidence' " and " 'moral certainty' "].)

Appellant says he disagrees with these opinions, but does not cite a single case supporting his view. We see no reason to revisit the issue.

Accordingly, we conclude the trial court properly instructed the jury regarding reasonable doubt.

## G.    *Sentencing Issues*

### 1.    *Multiple Life Sentences*

The trial court sentenced appellant to 13 consecutive terms of 15 years to life pursuant to section 667.61, commonly known as the "One Strike Law." (See *People v.*

*Anderson* (2009) 47 Cal.4th 92, 99.)  Specifically, appellant was sentenced pursuant to subdivision (b) of section 667.61, which provides for a sentence of 15 years to life when a defendant is convicted of certain enumerated sexual offenses (including, as relevant here, violation of §§ 288a (forcible oral copulation) & 261 (forcible rape)) and where the prosecution pleads and proves one or more specified aggravating circumstances (§ 667.61, subd. (b)).  Here, the jury made a true finding on one such aggravating factor, namely that "[t]he defendant has been convicted in the present case or cases of committing [an enumerated sexual offense] against more than one victim."  (§ 667.61, subd. (e)(4).)

Appellant contends that he should have been sentenced "at the most" to only five 15-years-to-life terms "one for each victim."  According to appellant, applying the multiple victim circumstance set forth in section 667.61, subdivision (e)(4) more than five times in this case violated the prohibition against multiple punishment set forth in section 654.  We reject his claims.

   a.  Section 667.61

The Legislature enacted section 667.61 to ensure serious sexual offenders receive long prison sentences regardless of their prior criminal records.  (*People v. Wutzke* (2002) 28 Cal.4th 923, 926, 929; see also *People v. Luna* (2012) 209 Cal.App.4th 460, 465.)  To this end, section 667.61, subdivision (b) provides, in relevant part, "any person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 15 years to life."  Subdivision (e)(4) of section 667.61 lists the following circumstance: "The defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) *against more than one victim.*" (Italics added.)

Appellant argues that section 667.61, subdivision (e)(5), authorizes only one life term per victim.  (*People v. DeSimone* (1998) 62 Cal.App.4th 693, 698.)  He argues that a contrary interpretation violates "the plain language and spirit of section 654."   He acknowledges that other appellate courts have applied the multiple victim circumstance more than once in a single case.  (See *People v. Murphy* (1998) 65 Cal.App.4th 35, 40-

30

41; *People v. DeSimone, supra,* 62 Cal.App.4th at pp. 697-698.)  However, he contends these cases are distinguishable because neither case involved the issue of imposing more than one multiple victim circumstance per victim.  Nevertheless, *People v. Valdez* (2011) 193 Cal.App.4th 1515 (*Valdez*) addresses this very issue and is directly on point.  In *Valdez,* the defendant committed, among other things, multiple One Strike offenses against three victims.  (*Id.* at p. 1518.)  There, the trial court sentenced the defendant to consecutive terms of 15 years to life on four counts, two of which involved the same victim.  (*Ibid.*)  There, as here, the defendant claimed the One Strike law permitted only one such sentence for each crime victim.  (*Ibid.*)

  *Valdez* rejected the argument as a matter of statutory interpretation of section 667.61, subdivision (e)(5).  In particular, *Valdez* stated, "As did the defendant in [*People v. Stewart* (2004) 119 Cal.App.4th 163 (*Stewart*)], defendant contends the multiple-victim circumstance is different in kind from the other enumerated circumstances because all of the others refer to aggravating factors, such as kidnapping or the use of a dangerous weapon, occurring in *the commission of the present offense*.  The *Stewart* court, however, cogently explained why that distinction makes no difference in terms of the statute's application: 'The statutory intent and scheme of Penal Code section 667.61, subdivision (e) is not difficult to discern.  Where the "present offense" against a victim is a qualifying offense and the gravity of that offense is enhanced by one of the circumstances enumerated in subdivision (e)(1), (2), (3), (4), (6), or (7), the life sentence mandated by the statute shall apply.  But even in circumstances where the subdivisions enumerated above do not apply, if a qualifying offense has been committed *against more than one victim,* the criminal conduct is considered equally severe and that conduct merits application of the statute so long as those offenses are prosecuted "*in the present case or cases.*"  ([]§ 667.61, subd. (e)(5).)'  (*Stewart, supra,* 119 Cal.App.4th at p. 171; see [] *Murphy*[*,supra,*] . . . 65 Cal.App.4th  [at p.] 41 . . . ['[I]n making multiple convictions for violent sex offenses punishable by multiple life sentences, the Legislature was expressing the view that *multiple violent sex offenses* deserve more severe punishment than a single

31

violent sex offense because of the *predatory nature of the perpetrator*'].)" (*Valdez, supra,* 193 Cal.App.4th at p. 1522; italics added.)

In this case, appellant was convicted of committing multiple offenses against five different persons, with a multiple victim circumstance finding as to each offense. To that extent, the facts in this case are the same as those in *Valdez*. *Valdez* upheld One Strike law sentences imposed on each of the offenses in that case. We believe the same result obtains here. The only real difference between the facts in *Valdez* and those in this case is that every offense the defendant committed in *Valdez* apparently was committed on a separate occasion (*Valdez, supra,* 193 Cal.App.4th at pp. 1519-1520) while, in the present case, appellant committed all his offenses on the same occasion as against each victim. As previously noted, appellant committed all of his offenses against: 1) Jane Doe I on April 17, 2009; 2) Jane Doe II on April 19, 2009; 3) Jane Doe III on September 11, 2009; and 4) Jane Doe IV on September 12, 2009. Nevertheless, the claims of the defendant in *Valdez* and appellant are the same, i.e., once a One Strike law sentence is imposed for an offense a defendant committed against a person, no such sentence can be imposed in the same case for another offense that defendant committed against that same person. (See *Valdez,* at p. 1522.)

However, as explained in *People v. Rodriguez* (2012) 207 Cal.App.4th 204, 213 (*Rodriguez*), the plain language of the One Strike law "establishes that such a [consecutive] sentence must be imposed on *each offense.*" (Italics added.) In reaching this conclusion, the court explained as follows: "Before September 2006, the One Strike law contained former subdivision (g), which stated that a One Strike sentence 'shall be imposed on the defendant *once* for any offense or offenses committed *against a single victim during a single occasion.*' [Citation.] If there are multiple victims during a single occasion, the term specified in subdivision (a) or (b) shall be imposed on the defendant once for each separate victim. '*Terms for other offenses committed during a single occasion shall be imposed* as authorized under any other law, including *Section 667.6,* if applicable.' " (*Rodriguez, supra,* 207 Cal.App.4th at p. 212, italics added.) In *People v. Jones* (2001) 25 Cal.4th 98, 100, 103, 107 (*Jones*), our Supreme Court concluded that the

Legislature, in enacting former subdivision (g), " 'intended to impose no more than one [One Strike] sentence per victim per episode of sexually assaultive behavior.' [¶] . . . [¶] However, in September 2006, prior to appellant's offenses in 2009, the Legislature amended the One Strike law to eliminate section 667.61, former subdivision (g) (Stats.2006, ch. 337, § 33, pp. 2165–2167), and the version of the One Strike law applicable to appellant's offenses does not contain it. The sole provision relevant to the sentencing of multiple offenses under the applicable One Strike law is section 667.61, subdivision (i), which states that 'the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6.' " (*Rodriguez, supra,* 207 Cal.App.4th at pp. 212-213, fn. omitted.)

*Rodriquez* further explained that "[a]s the Legislature eliminated subdivision (g), which the courts had interpreted to limit the number of One Strike sentences properly imposed on multiple offenses against a single victim on a single occasion, we infer that the Legislature intended to abrogate this restriction." (*Rodriguez, supra,* 207 Cal.App.4th at pp. 213-214.) Thus, the court concluded that "the applicable version of the One Strike law mandated the imposition of a 25-years-to-life sentence on *each* of appellant's eligible *offenses* . . . ." (*Id.* at p. 214, italics added.)

Here, appellant committed 13 offenses against five victims. The plain language of the One Strike law simply does not support a limitation of single life term per victim. Accordingly, the trial court did not err in sentencing appellant to a 15-years-to life sentence for each of appellant's eligible offenses.

> b. Section 654

Alternatively, appellant argues the imposition of multiple life terms violates the proscription against multiple punishment contained in section 654. Again, we disagree.

Preliminarily, the Attorney General asserts section 654 does not apply because the One Strike law is an alternative sentencing scheme, citing *People v. Anderson* (2009) 47 Cal.4th 92, 102 ["Like the Three Strikes law, the One Strike law is an alternative sentencing scheme"].) While appellant appears to concede the issue, he argues that a One

33

Strike term "plainly is added punishment under section 654 . . . ." (Italics omitted.) As we shall explain, even if section 654 is applicable, it does not preclude the sentence imposed.

Section 654 states an act or omission made punishable in different ways by different provisions may be punished under either of such provisions, "but in no case shall [it] be punished under more than one . . . ." Section 654 bars multiple punishment when a defendant is convicted of two or more offenses that are incident to one objective. (*Neal v. State of California* (1960) 55 Cal.2d 11, disapproved on another point in *People v. Correa* (2012) 54 Cal.4th 331, 341; *People v. Latimer* (1993) 5 Cal.4th 1203 [reaffirming *Neal*].) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective of the actor*. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California, supra,* 55 Cal.2d at p. 19, italics added.)

Here, the trial court found appellant committed multiple criminal acts on separate occasions. He is not being subjected to multiple punishments for the same act, nor is he being punished for the same act under different sections of the Penal Code. (See *People v. Massie* (1967) 66 Cal.2d 899, 908 ["A defendant may not bootstrap himself into section 654 by claiming that a series of divisible acts, each of which had been committed with a separate identifiable intent and objective, composes an 'indivisible transaction' "]; see also *People v. Britt* (2004) 32 Cal.4th 944, 952, ["[C]ases have sometimes found separate objectives when the objectives were . . . consecutive even if similar"]; *People v. Surdi* (1995) 35 Cal.App.4th 685, 689 [Multiple offenses were not subject to section 654 where "they were separated by considerable periods of time during which reflection was possible"]; *People v. Andra* (2007) 156 Cal.App.4th 638, 640 [In reviewing a defendant's claim that the court erred in failing to stay a sentence pursuant to section 654, the "defendant's intent and objective present factual questions for the trial court, and its findings will be upheld if supported by substantial evidence"].) Rather, he was convicted of 13 sex offenses that were committed against five different victims on five different

occasions. Consequently, section 654 does not bar imposition of the 13 consecutive sentences because appellant is not being punished for a course of conduct with but one intent and objective.

    c.  Constitutional Claims

   Appellant contends that trial court's "failure to follow state law–or at least exercise discretion . . . deprived appellant of his liberty interest in the correct application of state law and, hence, of due process of law." This contention is without merit. As discussed, the trial court did not err in applying the One Strike law and imposing 13 indeterminate sentences. Moreover, we are not convinced the trial court abused its discretion in imposing the 13 consecutive terms. Here, the trial court implicitly concluded the aggravating factors cited in the probation report outweighed the sole mitigating factor, i.e., appellant's lack of a prior criminal record. In short, appellant fails to establish the trial court's determination in this regard results in an arbitrary or capricious sentence. (*People v. Castellano* (1983) 140 Cal.App.3d 608, 615.)

   Finally, appellant makes a passing claim that application of the One Strike law "implicates constitutional principles of double jeopardy." This contention is without merit. He acknowledges that in the " 'multi-punishment' " context, double jeopardy precludes a court from imposing cumulative sentences for the same conduct only when the Legislature fails to specifically authorize such punishment. (*DeSimone, supra,* 62 Cal.App.4th at p. 700.) He, however, claims that the Legislature has not specifically authorized the punishment imposed in his case. He is mistaken. We will not rehash our analysis of this issue. Simply stated, the Legislature *has* authorized the punishment imposed in appellant's case, so double jeopardy concerns are not implicated. (*Ibid.*)

   *2.  Cruel and Unusual Punishment*

   Appellant next contends that his sentence of 195 years to life constitutes cruel and unusual punishment. We disagree.

   Preliminarily, the Attorney General argues that appellant has forfeited this issue by not objecting below on the grounds he raises on appeal. Electing to avoid a subsequent ineffective assistance of counsel claim, we exercise our discretion (see *In re Sheena K.*

(2007) 40 Cal.4th 875, 887) and review this otherwise forfeited claim, and conclude that it fails on the merits.

Under Article I, section 17 of the California Constitution courts have typically looked to the following factors: 1) the degree of danger the offender and the offense pose to society; 2) how the punishment compares with punishments for more serious crimes in the same jurisdiction; and 3) how the punishment compares with punishments for the same offense in other jurisdictions. (*In re Lynch* (1972) 8 Cal.3d 410, 425-427 (*Lynch*); *People v. Dillon* (1983) 34 Cal.3d 441, 479-482.) The Eighth Amendment to the United States Constitution also contains a " 'narrow proportionality principle,' " but application of that principle is reserved for " 'extreme sentences that were grossly disproportionate to the crime." (*Ewing v. California* (2003) 538 U.S. 11, 20, 23.)

Appellant's argument focuses on the first prong of the *Lynch* analysis, i.e., the nature of the offense and the danger he poses to society. He asserts that his punishment is disproportionate given his lack of a criminal record, his education and employment history, together with the fact that "[t]esting placed him in the low risk category for sexual reoffending." Appellant's lack of criminal history aside, his convictions involved numerous sexually violent crimes against five young women. True, the probation department report assessed him as a low risk for recidivism, but his pattern of targeting young, vulnerable women, coupled with his threats and statements that he was affiliated with law enforcement, demonstrated an intent to avoid detection by intimidating his victims. Under the circumstances, his sentence is neither shocking nor inhumane when the nature of the offenses and offender are considered. (See, e.g., *People v. Dillon, supra,* 34 Cal.3d 441, 479, 482-488 [determinations whether a punishment is cruel or unusual may be based solely on the nature of the offense and offender]; *People v. Weddle* (1991) 1 Cal.App.4th 1190, 1198–1200.)

36

### 3. Conduct Credits

Appellant contends, and the Attorney General concedes, he is entitled to presentence conduct credits. We agree.

Section 4019 governs the award of presentence conduct credits. Section 2933.1, subdivision (c), provides in relevant part: "Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement in . . . a county jail . . . following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)." Section 2933.1, subdivision (a), applies to "any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 . . . ." Forcible rape is listed in section 667.5, subdivision (c)(3). Forcible oral copulation is listed in section 667.5, subdivision (c)(5).

Appellant was in county jail for 880 actual days prior to being placed in the custody of the Director of Corrections to begin serving his prison sentence. Consequently, appellant is entitled to a 15 percent credit for his time in presentence custody. (§ 2933.1, subd. (c).) Thus, appellant should have been awarded 132 days of conduct credit, for a total of 1012 days credit. We shall order the abstract of judgment be modified accordingly.

### 4. Clerical Error

Appellant argues, and the Attorney General concedes, the sentencing minute order and the abstract of judgment must be amended to eliminate a stated sentence on count 11. We agree.

The trial court declared a mistrial as to count 11 after the jury deadlocked. Accordingly, the abstract of judgment and sentencing minutes must be amended to remove the reference to a conviction for count 11. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [appellate courts may order correction of clerical errors].)

37

*H.*     *Cumulative Error*

Finally, appellant contends that the cumulative effect of the alleged errors warrant reversal. We reject this contention. The premise behind the cumulative error doctrine is that while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.) Here, we have rejected nearly all of appellant's claims of error. To the extent any instructional errors were identified above, they "were harmless, whether considered individually or collectively. [Appellant] was entitled to a fair trial but not a perfect one. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) We have found no prejudice when considering his claims of error separately. Viewed cumulatively, our conclusion is the same. Appellant was not deprived of a fair trial.

### III. DISPOSITION

The abstract of judgment and sentencing minute order are corrected to reflect : 1) 1012 days of presentence conduct credit pursuant to sections 4019 and 2933.1; and 2) appellant's acquittal on count 11. The superior court clerk is directed to prepare and forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.

_____

REARDON, J.

We concur:

_____

RUVOLO, P. J.

_____

RIVERA, J.

*People v. Andrade* A135438

39

Trial Court:                        Alameda County Superior Court


Trial Judge:                        Hon. Allan Hymer


Counsel for Defendant and           Joseph Shipp
Appellant:


Counsel for Respondents:            Attorney General of California
                                    Kamala D. Harris
                                    Arthur Beever


*People v. Andrade*  A135438