Filed 9/22/15  P. v. Lopez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE MARTIN LOPEZ,<br><br>    Defendant and Appellant. | F068446<br><br>(Super. Ct. No. BF143321A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Jose Martin Lopez was convicted at the conclusion of a jury trial of six counts of torture (Pen. Code,[1] § 206, counts 1–6), mayhem (§ 203, count 8), corporal injury to the mother of his children (§ 273.5, subd. (a), count 9), two counts of assault with a deadly weapon (§ 245, subd. (a)(1), counts 10 & 11), and false imprisonment with violence (§ 236, count 12). In count 7, the jury acquitted defendant of attempted murder (§§ 664, 187, subd. (a)), but found him guilty of the lesser included offense of attempted voluntary manslaughter (§§ 664, 192, subd. (a)). The jury also found true the great bodily injury allegations alleged as to each count.

With the exception of count 8, defendant was sentenced to a determinate sentence of 20 years 10 months on counts 7 through 12, including the enhancements for great bodily injury. With the exception of count 2, defendant was sentenced on counts 1 through 6 to a determinate sentence of 25 years for the great bodily injury enhancements and to consecutive indeterminate sentences of life with the possibility for parole.[2]

On appeal, defendant contends there was insufficient evidence to support the true finding that he committed great bodily injury on count 11, assault with a deadly weapon. Defendant argues the trial court erred in failing to instruct the jury on count 11 on the lesser included offense of simple assault. Defendant contends the trial court erred in failing to apply section 654 to his attempted manslaughter conviction on count 7. Defendant finally argues the court erred in imposing consecutive sentences because his sentence was disproportionate and constituted cruel and unusual punishment. We affirm the judgment.

---

[1]Unless otherwise designated, all statutory references are to the Penal Code.

[2]Sentences on counts 2 and 8 and the great bodily injury enhancements alleged as to those counts were stayed pursuant to section 654.

2.

# FACTS

## *Prosecution Evidence*

Defendant lived with Kimberly McCants and her four children for five years. Defendant fathered three of the children, who were ages two through four at the time of trial; the fourth child was McCants's son from a prior relationship. They initially lived with defendant's brother. At the beginning of their relationship, McCants and defendant "fought a little bit" when defendant would accuse McCants of looking at or talking to other men, including defendant's brother. McCants was not allowed to look at defendant's brother and would have to keep her face down and go straight to her room when she entered the house. McCants never had a relationship with defendant's brother.

Defendant would not allow McCants to have any conversations with his male friends or male members of his family. When McCants and defendant moved into a house of their own, defendant accused McCants of already knowing a single, male neighbor who moved in next door. McCants did not know the neighbor. Defendant made McCants stay in the house all the time, and she could not even go outside with her children. McCants was not allowed to look out of the windows. When driving in the car, McCants would have to hold her head down so she could not see anyone walking down the street. If defendant thought McCants looked at a man while they were driving, he would turn around and slap her and tell her to keep her head down.

Defendant made McCants walk into the front door of their home backwards so she could not see the male neighbor in the apartment behind their residence. Defendant accused McCants of talking to the neighbor through the common wall of their bedroom. Defendant accused McCants of sneaking out at night, so he would barricade the door by placing toys in front of it.

McCants started to get noticeable injuries to her wrists and ankles. She could only wear long sleeves, even during summer, because she did not want her family to see she had marks on her arms.

3.

Defendant threatened McCants that he would find where she was if she left him. Defendant threatened McCants's family. She believed his threats because he always carried them out. The physical abuse became more intense with time and the intervals between attacks became shorter.

Defendant would tie McCants down at night on the mattress. Defendant used a pair of handcuffs he had from a prior job as a security guard. He would handcuff McCants's hands together. Later, he made her lie flat on the bed and he would handcuff one of her hands to the side of the mattress and zip-tie the other hand to the other end of the mattress. Defendant accused McCants of using her feet to get out so he tied her feet together with a rope and then tied them to the hall closet so she could not move her legs at all. McCants could not get out; she never consented to being tied up.

Defendant bound McCants so tightly with the handcuffs, ties, and ropes that when she woke up in the morning her wrists and ankles were always bleeding. These remained open wounds that only healed after McCants was later hospitalized. McCants suffered permanent scarring on her wrists and ankles from these wounds. Whenever defendant tied down McCants in this fashion, he would become frustrated and bite her as hard as he could. McCants suffered scarring from defendant's teeth marks.

Over a period of time, defendant injured McCants by hitting her in the ear with his fists. The first time defendant's actions sent McCants to the hospital was after he stabbed her hand with a steak knife. McCants told the hospital staff that she stabbed herself with the knife while reaching down into the sink washing dishes.

On another occasion, defendant was hitting McCants in the head with a child's toy. When McCants tried to block the blows with her hand, defendant "took out the end of [her] pinky" finger. McCants did not go to the hospital for a week and told the nurse she shut the van door on her finger. McCants went to the hospital a third time after defendant stabbed her right leg on the side of her upper thigh with a butcher knife during an argument. Defendant would not let McCants go to the hospital for a couple of days

4.

until after she coughed and the wound started gushing blood. McCants told hospital staff she fell on a piece of glass while at the river.

Eventually, defendant used a hammer and an aluminum baseball bat, in addition to his hands, to hit McCants. Defendant and McCants received a 60- or 90-day eviction notice to leave their rental property by August 1, 2012. Defendant blamed McCants for the eviction. Defendant made McCants sit on the couch and hug a couch pillow so no one would hear her scream when he hit her with the aluminum bat. Defendant would hit McCants in the back with the bat. Two days prior to August 1, 2012, defendant hit McCants with the bat and split open her left knee straight to the bone.

During the two days prior to August 1, 2012, McCants's back was very sore and she was unable to move or to walk. She was no longer able to control her bladder when defendant hit her with the bat. Defendant sometimes laughed at McCants and other times he yelled at her because he said she was urinating in her pants on purpose. Defendant told McCants he would continue to hit her until she did what she was supposed to do. It got to the point that whenever defendant hit McCants, she would lose control of her bladder. Defendant made McCants clean herself and the floor after these episodes.

When asked if she felt free to leave her relationship with defendant, McCants replied, "Absolutely not." A night or two before the end of their relationship, defendant threatened to kill McCants. Defendant asked McCants if she wanted to die on the couch or in the bathtub. McCants begged defendant not to kill her. Defendant said he had to because it had gone too far and killing McCants was the only way he had out.

Defendant would not allow McCants to get medical attention for her knee because there would not be a logical explanation for her injuries. One time defendant hit McCants flat on her hand with the bat. This moved the knuckle on her ring finger "all the way to the back of [her left] hand." Defendant would not let McCants get medical attention for that injury and she later required two hand surgeries.

In one episode, defendant ordered McCants to wash the dishes. She was so weak she could not get off the floor. Defendant kept hitting McCants on her shoulders with a baseball bat. McCants begged defendant to stop. He replied that he would not stop until he knew he broke a bone. McCants heard "a bunch of cracking" in her shoulders.

Defendant also used a hammer to beat McCants on a couple of occasions. The first time was just before the last incident on August 1st. Defendant hit her toes hard enough that one toe split open. The evening before August 1st, defendant hit McCants with a baseball bat so hard in the back of her ribs that she could hardly breathe. This knocked the wind out of her. When McCants could not breathe, she was very scared and thought she was dying.

McCants remembered her oldest son bringing a baby mattress into the living room for her and lying down on the mattress trying to sleep. The next thing McCants could remember, she woke up a week later in the hospital. McCants had injuries on her body that were not present before she passed out.

McCants suffered permanent scars and lumps between her breasts and her toes from the beatings. She also had visible injuries to her forehead, chin, knee, legs, and ears. McCants identified other injuries she suffered to her right foot, ankles and wrists from the bindings applied by defendant. McCants identified photographs of injuries to her stomach resulting from trauma caused by defendant.

On August 1, 2012, Senior Deputy William Hakker of the Kern County Sheriff's Department was dispatched to the apartment where McCants and defendant lived. Hakker found McCants lying unconscious on a mattress on the living room floor. She was extremely pale and nonresponsive. McCants was transported by ambulance to the hospital followed by Hakker.

When Hakker arrived, the hospital staff had removed McCants's clothing and bandages. Hakker identified photographs depicting the injuries he saw to McCants, including injuries to both wrists and ankles, swelling of her ankles, and bruising over her

6.

entire body in different locations, including her shoulders. McCants had open sores on her body that were scabbed over.

Dr. Peter Ellis was the emergency room physician who attended to McCants when she was brought to Memorial Hospital in Bakersfield. Dr. Ellis described McCants's condition as grave. He did not expect her to survive. McCants was very pale, her blood pressure was extremely low, and her vital signs were unstable. The hospital staff had to "do a lot of things quickly to try save her life."

McCants had obvious signs of bleeding: her hemoglobin level was very, very low, she was unresponsive, nearly without any blood, and in a coma. The pH of McCants's blood was low, indicating it was not circulating properly. The only reason Dr. Ellis did not think McCants was dead was because she was still breathing. McCants was in danger of having her liver and kidneys go into shock and shutting down.

McCants had head injuries, including a large gash to her head. McCants had deep ligature marks around her wrists and ankles that extended into the dermis of her skin. The ligature wounds on her wrists and ankles were becoming gangrenous. Wounds that deep leave scars. The wounds were not consistent with self-inflicted cuts. McCants had multiple rib fractures and an extensive injury to her entire upper chest that included significant swelling. McCants had a pneumothorax injury, a rib fracture that damaged and partially deflated one of her lungs. It was a possible source of blood loss. McCants also had significant swelling over her shoulders.

Dr. Ellis explained that such massive swelling to the chest and shoulders was where McCants likely suffered blood loss. A large amount of blood was drained from McCants after a chest tube was inserted. This procedure caused so much more bleeding that McCants had to be transfused with more blood, the drainage tube was abandoned, and Dr. Ellis had to attend to McCants's lung. McCants had fractures to two lower lumbar vertebrae.

Dr. Ellis concluded McCants was one of the most traumatic cases he had seen in many years. According to Dr. Ellis, McCants had at least four or five different processes happening to her that could have caused imminent death; she was extremely ill. In 20 years of emergency room practice, Dr. Ellis had never seen a patient with injuries as extensive as McCants's live and walk out of the hospital.

Steven Gash, a neighbor, testified the only yelling he ever heard came from defendant. He never heard McCants yelling at defendant. McCants's oldest son, who was in second grade at the time of trial, testified he saw defendant tie his mother to the bed more than one time. He also saw marks and other injuries on his mother's feet. McCants's son saw defendant use a gray metal bat on his mother more than once. Defendant told the boy not to call an ambulance for his mother. The evening before McCants went to the hospital, her son saw his mother pass out.

### Defense Evidence

Defendant's aunt and cousin testified they never saw any injuries to McCants and never observed violence between the two. Defendant's ex-girlfriend from 2000 testified she had a good relationship with defendant, they never fought, and defendant was never aggressive or violent toward her.

Defendant testified that his relationship with McCants began well and they were happy together. According to defendant, McCants started to cut herself with knives. McCants said she hated her life, and defendant had to hide knives from her. Defendant said things got so bad, he had no choice but to restrain McCants. They had no money to get help for McCants. Defendant and McCants came up with the zip-tie idea together. McCants once tried to jump out of a moving vehicle after complaining that she hated her life.

Defendant asserted that McCants kept cutting herself. Defendant denied threatening to kill McCants. Defendant said he only asked her where she wanted to die because she kept cutting herself. Defendant had to hide kitchen knives as well as his

8.

tools. Defendant admitted he might have hit McCants with a baseball bat because things "escalated," but he denied hitting McCants with a hammer.

The evening of July 31, 2012, defendant said he had a heated argument with McCants and "things might have got a little out of hand." Defendant said he grabbed McCants by the shoulders and shook her with his hands. Defendant explained the old bruises on McCants's shoulders were not caused by him. Defendant told McCants she had to stop cutting herself. When defendant woke up the next morning, McCants was unresponsive and he started crying. He panicked as he tried to wake her up and slapped her face. Defendant called 911.

Defendant admitted hitting McCants with a bat, though he was unsure how many times he hit her with it. Defendant acknowledged that things escalated, but he did not remember details from the evening of July 31st. Defendant said he did not notice something was wrong with McCants until he woke up on August 1st. Defendant had not told investigators he had beat McCants with a bat or that there was an altercation the night before because he was scared.

### Rebuttal Evidence

When investigators arrived at the apartment defendant and McCants shared, there was blood on a mattress in the location where the head would rest. Bloody bandages were found in the Dumpster outside the apartment. Defendant denied to officers he ever hurt McCants and said she hurt herself.

## DISCUSSION

### 1.      True Finding of Great Bodily Injury on Count 11

The prosecutor argued to the jury that the hammer blow to the victim's shoulder causing her to lose her breath constituted great bodily injury as alleged in count 11. Defendant argues the victim's testimony she had the wind knocked out of her from a

9.

hammer blow to her shoulder was factually insufficient to constitute great bodily injury. We reject defendant's factual and legal assertions.

Great bodily injury is defined as significant or substantial physical injury as distinguished from injuries that are trivial or cause only moderate harm. (§ 12022.7, subd. (f); *People v. Cross* (2008) 45 Cal.4th 58, 63-64; *People v. Escobar* (1992) 3 Cal.4th 740, 749-750.) Our Supreme Court has long held that determining whether a victim has suffered great bodily injury is a factual inquiry to be resolve by the jury, not a question of law for the court. There can be a fine line dividing a significant or substantial injury from one that does not meet the description. (*People v. Cross*, *supra*, at pp. 63-64; *People v. Escobar*, *supra*, at pp. 750-752.) Great bodily injury "is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury." (*Cross*, *supra*, at p. 66.)

A finding of great bodily injury will be sustained when there is "some physical pain or damage, such as lacerations, bruises, or abrasions." (*People v. Washington* (2012) 210 Cal.App.4th 1042, 1047.) For example, a great bodily injury finding was sustained where the victim suffered a severely swollen jaw, sore ribs for two weeks, cuts to the arms, and bruises to the head, neck, and back. (*People v. Corona* (1989) 213 Cal.App.3d 589, 592-593.) The finding was also sustained where the victim was strangled with a scarf to the point of nearly passing out, felt herself choking, could not breathe, had a swollen eye and bleeding nose, saw blood on herself, felt pain in her neck, and had a large lump on her neck. (*People v. Mixon* (1990) 225 Cal.App.3d 1471, 1489.)

We consider the injury McCants suffered to her shoulder to be greater than the injuries suffered by the victims in the above cited authorities. Defendant hit McCants's shoulder with a hammer. This did more than knock the wind out of her, as defendant now contends. When McCants was brought to the emergency room, she had massive swelling over her upper chest area and shoulder. Dr. Ellis testified such an extensive enlargement of McCants's chest and shoulder could have been a source of blood loss.

10.

Dr. Ellis further testified McCants had a very low hemoglobin level, she was unresponsive, nearly without blood, and in a coma. The pH of McCants's blood was low, indicating it was not circulating properly. McCants was in danger of her liver and kidneys going into shock and shutting down. The only reason Dr. Ellis did not think McCants was dead was because she was still breathing. Though some of McCants's blood loss was from external bleeding, she was also bleeding internally, including from her chest and shoulder injuries. McCants's blood loss from her shoulder injuries contributed to her loss of blood, necessitated blood transfusions, and nearly led to the loss of McCants's life.

Great bodily injury "is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury." (*People v. Cross*, *supra*, 45 Cal.4th at p. 66.) The injuries to McCants's shoulder caused massive swelling in addition to loss of breath. Defendant's assault with a hammer led, in part, to McCants's hospitalization. The fact the shoulder injury contributed to McCants's loss of blood, low hemoglobin, and low blood pH—which combined threatened the shut-down of her liver and kidneys as well as her death—places the facts of this case beyond the injuries that constituted great bodily injury as discussed in *Corona*, *Mixon*, and *Washington*. There was substantial evidence in the record to support the jury's finding McCants suffered great bodily injury as alleged in count 11.

### 2. Lesser Included Instruction for Simple Assault

The jury received the standard felony assault instruction on count 11 using the language of CALCRIM No. 875. Defense counsel requested and was refused a simple assault instruction on counts 10 and 11. Defendant contends the trial court erred in refusing to instruct the jury on simple assault as a lesser included offense to felony assault on count 11. Defendant argues the hammer was not used in a manner to cause death or great bodily injury. We reject this contention.

11.

Defendant acknowledges an instrument not inherently dangerous can become so depending on how it is used. A pillow, for example, could be used to smother someone but is not otherwise a deadly weapon. (*People v. Page* (2004) 123 Cal.App.4th 1466, 1472-1473 [pencil deemed a deadly weapon because of its manner of use].) Defendant argues the assault in count 11 did not involve injuries so extensive as to necessarily amount to the hammer's use as a deadly weapon.

A trial court is required to instruct on lesser included offenses when the evidence raises a question as to whether all the elements of the charged offense were present, but not when there is no evidence the necessarily included offense was less than that charged. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) Where evidence supporting the lesser included offense exists, the trial court has a sua sponte duty to give the instruction even without a request by the defendant. On the other hand, the trial court is not obligated to instruct on theories without evidentiary support. (*People v. Smith* (2013) 57 Cal.4th 232, 239-240.)

As used in section 245, subdivision (a)(1), a deadly weapon is any object, instrument, or weapon used in a way capable of producing, and likely to produce, death or great bodily injury. Some objects such as dirks and blackjacks have been held to be deadly as a matter of law. Other objects, though not deadly per se, may be used in a manner likely to produce death or great bodily injury. In determining whether an object that is not inherently deadly or dangerous is used in such a manner, the trier of fact may consider the nature of the object, the manner it was used, and all other facts relevant to the issue. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029.)

Section 245 prohibits an assault by means of force likely to produce great bodily injury, not the use of force that does in fact produce such an injury. The crime can be committed without the infliction of any physical injury and no blow need be struck. The focus is on the force actually exerted by the defendant, not the amount of force that could have been used. Force likely to produce great bodily injury can be found where the

attack is made by the use of hands or fists. (*People v. Brown* (2012) 210 Cal.App.4th 1, 7 [use of BB gun causing red welts on one victim's foot and the other victim's back].)

In *People v. McDaniel* (2008) 159 Cal.App.4th 736, two assailants repeatedly punched the victim about the head and upper body with closed fists, causing one assailant to fracture his own knuckle, and the victim to suffer other abrasions and contusions. The victim also suffered a bloody nose, scratches on his face, and lacerations on his neck requiring stitches. The defendant continued to punch the victim even after police officers intervened. *McDaniel* found there was no evidence to warrant instructions on simple assault and there was no way a jury could reasonably conclude the force applied to the victim's face and head was not likely to cause him to suffer great bodily injury. (*Id.* at p. 749.)

The instant action is factually apposite to *McDaniel* and we apply its holding here. Other authorities have found a hammer deployed as a weapon is capable of deadly and dangerous use. (*People v. Seaton* (2001) 26 Cal.4th 598, 665; *People v. Van Every* (1933) 133 Cal.App. 354, 357.) The defendant's use of a hammer as alleged in count 11 constituted assault with a deadly weapon by means likely to produce death and great bodily injury. There was nothing benign, ambiguous, or merely threatening in how defendant used the hammer on McCants's shoulder. He threatened her life by his conduct and his words, and he caused great bodily injury to her shoulder as discussed above.

There are no facts in the record to support a jury instruction on the lesser included offense of simple assault from defendant's use of a hammer. If the jury did not believe defendant used a hammer on the victim's shoulder, it would have acquitted him of count 11. There was no evidence that when defendant wielded the hammer, his conduct only amounted to simple assault. Under the standard set forth in *People v. Breverman*, *supra*, 19 Cal.4th 142, a lesser included instruction was not required where there was no

13.

evidence to support that theory. The trial court did not err in denying defendant's motion for an instruction on simple assault.

## 3.     Alleged Section 654 Error

The trial court found defendant harbored a separate intent to kill McCants and committed separate acts of violence when he perpetrated attempted voluntary manslaughter. The court sentenced defendant to an upper term sentence of five years six months for attempted voluntary manslaughter on count 7 plus a consecutive term of five years for the great bodily injury allegation alleged as to that count.

Defendant contends the trial court's sentence violated section 654 because the most likely act placing the victim's life in danger was hitting her in the ribs with a baseball bat, breaking ribs that punctured one of her lungs. Defendant was convicted for this conduct in count 3, one of the torture allegations. Defendant argues he was already sentenced on count 3 for causing the rib fracture and lung injury. Defendant contends section 654 should apply to both his conviction for count 7 as well as to the great bodily injury enhancement alleged on that count. We disagree.

Section 654 protects against multiple punishment. The statute literally applies only where such punishment arises out of multiple statutory violations produced by the same act or omission. Where the defendant is convicted of multiple offenses, if the additional offenses are merely incidental to or were the means of facilitating a single objective, the defendant may be found to have harbored a single intent and can be punished only once. (*People v. Harrison* (1989) 48 Cal.3d 321, 335, cited with approval in *People v. Correa* (2012) 54 Cal.4th 331, 342-343.) Section 654 prohibits multiple punishment for a single physical act that violates different provisions of law. (*People v. Jones* (2012) 54 Cal.4th 350, 357-360 [overruling *In re Hayes* (1969) 70 Cal.2d 604].)

It is the defendant's intent and objective, not the temporal proximity of his or her offenses, which determines if the transaction is divisible. (*People v. Capistrano* (2014)

14.

59 Cal.4th 830, 886-887; *People v. Harrison*, *supra*, 48 Cal.3d at p. 335.) What constitutes a single physical act may not always be easy to ascertain. "In some situations, physical acts might be simultaneous yet separate for purposes of section 654." (*People v. Jones*, *supra*, 54 Cal.4th at p. 358.)

There must be evidence to support the trial court's finding the defendant formed a separate intent and objective for each offense for which he or she was sentenced. The defendant's intent and objective are factual questions for the trial court. We view the evidence in the light most favorable to the trial court's ruling. (*People v. Capistrano*, *supra*, 59 Cal.4th at pp. 885-886, 887.) A trial court's finding, express or implied, that a defendant harbored a separate intent and objective for each offense is upheld on appeal when supported by substantial evidence. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368, limited on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

Defendant analogizes his sentences on counts 3 and 7 to *Jones* where the Supreme Court held it was error for a defendant to be punished multiple times for the possession of a single firearm. (*People v. Jones*, *supra*, 54 Cal.4th at p. 358.) Defendant argues his single act of hitting McCants in the ribs with a baseball bat cannot be punished twice for torture in count 3 and attempted voluntary manslaughter in count 7, regardless of how many separate intents he harbored.

As noted by the People, although the baseball bat blow that fractured McCants's ribs and punctured her lung may have been the most severe blow, it was not the only blow she received during defendant's final, prolonged beating. The People further argue there was no testimony from Dr. Ellis, or any other witness, that McCants's fractured ribs were the only injuries placing her in mortal danger. Dr. Ellis testified McCants had at least four or five different processes that could have caused her imminent death. We find the People have accurately analyzed the evidence adduced at trial and agree with their assessment McCants's life was imperiled by more than one single act by defendant.

15.

A night or two before the end of their relationship, defendant threatened to kill McCants. Defendant asked McCants if she wanted to die on the couch or in the bathtub. McCants begged defendant not to kill her. Defendant said he had to because it had gone too far and killing McCants was the only way he had out. The next thing McCants could remember was waking up a week later in the hospital. McCants had injuries on her body that were not present before she passed out.

Defendant committed more acts than were charged by the prosecution, including the injuries McCants suffered after she passed out, which she could not account for. Prior to defendant's final, brutal beating of McCants, he asked her where she wanted to die. Defendant told McCants he had to kill her because he had gone too far.

After beating McCants the evening of July 31st, and after she lost consciousness, there is evidence defendant continued to beat her. McCants, now unconscious, was in a fragile physical state that would have been obvious to anyone. From defendant's continued beating of McCants we can reasonably infer he was executing his earlier formed intent to kill her. McCants's condition was made more precarious by defendant's delay in obtaining medical assistance for her. Defendant's conduct evidenced both the intent to kill McCants and constituted additional conduct that was not separately charged by the prosecutor in the information.

The Supreme Court in *McKinzie* upheld an implicit finding the defendant harbored multiple objectives in committing burglary and either carjacking or kidnapping. There, the offenses originated from a confrontation in the victim's garage between the defendant and the victim. After kidnapping and disposing of the victim's body, the defendant went into the victim's apartment and stole her property. Although there was a course of conduct, our high court found the defendant's conduct divisible. (*People v. McKinzie*, *supra*, 54 Cal.4th at pp. 1368-1369.) In *Capistrano*, the Supreme Court found the home invasion robbery against multiple victims soon followed by the carjackings of the victims also constituted divisible conduct subject to punishment for each offense. The court

16.

rejected the defendant's continuous course of conduct argument. (*People v. Capistrano*, *supra*, 59 Cal.4th at p. 887.)

We conclude this case is factually analogous to *McKinzie* and *Capistrano* and distinguishable from *Jones*. There was evidence to support the trial court's express finding defendant's intent to kill McCants was separate from the other charged offenses of torture, assault with a deadly weapon, mayhem, and domestic violence. The trial court did not violate section 654 in sentencing defendant to consecutive sentences for count 7 and the related great bodily injury enhancement.

**4.      Alleged Abuse of Sentencing Discretion**

Defendant contends the trial court abused its sentencing discretion because the imposition of consecutive life terms and consecutive determinate terms "exceeds any reasonable life expectancy" and exceeds the sentence he would have received if he had succeeded in killing McCants. Defendant argues some of his convictions involved "a single outburst of violence which should not have produced consecutive terms." Defendant also suggests imposition of multiple life terms may run afoul of the federal Constitution's Eighth Amendment limitation on cruel and unusual punishment.

The People reply defendant's trial counsel objected to aspects of the probation officer's report, including the recommendation for consecutive life and determinate sentences. Defendant also argued his consecutive life sentences were subject to section 654 and should be stayed. But he did not raise a claim his sentence was cruel and unusual. The People contend this argument has been forfeited for appellate review. (*People v. Scott* (1994) 9 Cal.4th 331, 356.) The People do not allege forfeiture of defendant's argument that the trial court erred in sentencing him consecutively because he had a single outburst of violence.

To avoid a subsequent ineffective assistance of counsel claim, we exercise our discretion to review this otherwise forfeited claim. (See *In re Sheena K.* (2007) 40

17.

Cal.4th 875, 887.)  To the extent defendant's argument impliedly challenges the proportionality of his sentence, we note the Eighth Amendment also contains a narrow proportionality principle reserved for extreme sentences that are grossly disproportionate to the offenses committed by the defendant.  (*Ewing v. California* (2003) 538 U.S. 11, 20.)

Defendant's cruel and unusual punishment argument relies on the recent United States Supreme Court decision in *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455], which found an Eighth Amendment violation where a juvenile was subject to a mandatory sentence to life without the possibility of parole.  The California Supreme Court reached a similar conclusion where a juvenile received a sentence of over one hundred years for a noncapital offense, a span beyond the natural life expectancy of the offender.[3]  (*People v. Caballero* (2012) 55 Cal.4th 262, 266-269.)  Defendant's argument concerning juvenile offenders is inapposite to his case because juvenile offenders, even those tried as adults, are in a completely separate class of offenders from adults who commit crimes.  Defendant was 27 years old when he committed the instant offenses and was a year older when he was sentenced.

Concerning defendant's Eighth Amendment challenge, we note his cruel and unusual punishment argument does not fall within the narrow proportionality principle in the Eighth Amendment reserved for extreme sentences that are grossly disproportionate to the offenses committed by the defendant.  (*Ewing v. California*, *supra*, 538 U.S. at p. 20.)  As discussed in detail below, defendant's conduct toward his victim was so egregious and prolonged, we find no gross disproportionality or violation of the Eighth Amendment's cruel and unusual punishment clause.

---

[3]In *People v. Palafox* (2014) 231 Cal.App.4th 68, 73-92, this court held a juvenile who committed homicide could be sentenced to life without the possibility of parole where the term imposed was not mandatory and the sentencing court properly evaluated all relevant sentencing criteria, including mitigating factors.

Article 1, section 17 of the California Constitution sets forth three factors for courts to consider when analyzing whether a sentence is cruel or unusual: (1) the degree of danger the offender and the offense pose to society; (2) how the punishment compares with punishments for more serious crimes; and (3) how the punishment compares for the same offense in other jurisdictions. (*People v. Dillon* (1983) 34 Cal.3d 441, 479-482; *In re Lynch* (1972) 8 Cal.3d 410, 425-427; *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1310.) The court in *Andrade* did not find a sentence of 195 years disproportionate, shocking, or inhumane for a violent sex offender who lacked a criminal history but who, nevertheless, committed his crimes on young, vulnerable women, threatened his victims, and claimed an affiliation with law enforcement to avoid detection. (*Andrade*, *supra*, at p. 1310.)

The first factor applied to the *Lynch* analysis of whether a sentence is cruel or unusual is the degree of danger the offender and the offense, or offenses, pose to society. Defendant's binding, beating, false imprisonment, torture, mayhem, cruelty, and abuse of McCants was so severe it shocks the conscience.

Dr. Ellis had never seen any patient survive injuries as extensive as those inflicted by defendant on McCants. Over the course of time, McCants was turned into the equivalent of a slave to defendant's binding, abuse, and torture. When McCants was finally brought belatedly to the hospital, she had gangrene forming in her wrists and ankles. She had bled so extensively she was nearly without hemoglobin and was in danger of liver and kidney failure. McCants had a punctured lung and multiple skeletal fractures, including to her lumbar vertebrae. She required two surgeries to repair her severely damaged hand. We find the degree of danger these offenses posed to society is very great under the *Lynch* analysis.

A life term for torture is not cruel and unusual punishment under the California or United States Constitution. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1474-1476; *People v. Barrera* (1993) 14 Cal.App.4th 1555, 1566-1570.) The psychological torture

19.

McCants suffered—as well as that of her oldest child who watched at least some of defendant's torturous conduct—verges on the incomprehensible. The "brutality and depravity displayed" by defendant was extreme. It was defendant's "conduct, not his sentence, that was cruel and unusual." (*People v. Wallace* (1993) 14 Cal.App.4th 651, 666.) We therefore reject defendant's argument his sentence was disproportionate compared to what he would have received had he killed McCants.[4]

Comparing defendant's sentence to other offenses with indeterminate life sentences, we observe that lengthy noncapital sentences have been upheld in a variety of other sentencing scenarios. A defendant convicted of violating the three strikes law for being an ex-felon in possession of a handgun has not received a sentence of 25 years to life in violation of the state or federal Constitution. (*People v. Cooper* (1996) 43 Cal.App.4th 815, 819-831.) The one strike law for sex offenses under section 667.61 mandating an automatic minimum sentence of 25 years to life has been upheld against constitutional challenges. (*People v. Crooks* (1997) 55 Cal.App.4th 797, 803-812; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230-1232 [upholding a sentence of 135 years pursuant to the one strike law].) A sentence of over 283 years for multiple sex offenses not charged under the one strike law has overcome a challenge based on cruel and unusual punishment. (*People v. Wallace*, *supra*, 14 Cal.App.4th at pp. 666-667.)

In *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 842-846, another defendant without a criminal record committed aggravated mayhem (by slashing the victim's face to the point of being unrecognizable), attempted murder, and first degree burglary. He received a sentence of two concurrent life terms with the possibility of parole plus a determinate sentence of four years. (*Id*. at pp. 827-831.) The *Szadziewicz* court did not

---

[4]Had McCants died, and she nearly did, it would have been from the torture and assaults defendant inflicted on her. Torture is a special circumstance under the death penalty law in California. (§ 192.2, subd. (a)(14).)

find the defendant's sentence disproportionate or cruel and unusual pursuant to the Eighth Amendment. (*Szadziewicz*, *supra*, at pp. 844-846.)

We conclude the second factor for determining whether a sentence is cruel or unusual—how other offenses are punished in California—does not demonstrate defendant's sentence was cruel or unusual.[5] Finally, we find defendant's conduct was not the result of a single outburst of violence. The bindings and many of the injuries defendant inflicted happened long before the last two days of violence. The final two days of violence also did not occur during one single outburst. The trial court did not abuse its sentencing discretion when it imposed consecutive determinate and indeterminate sentences.

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
KANE, Acting P. J.


_____
DETJEN, J.

---

[5]The third factor in constitutional analysis employed by California courts—how the punishment compares for the same offense in other jurisdictions—need not be reviewed under the facts of this case. (See *People v. Dillon*, *supra*, 34 Cal.3d at p. 487, fn. 38; *People v. Szadziewicz*, *supra*, 161 Cal.App.4th at p. 846.)