Filed 8/8/16  P. v. Schneider CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE**, <br>     **Plaintiff and Respondent,** <br> **v.** <br> **JONATHON M. SCHNEIDER,** <br>     **Defendant and Appellant.** | **A145308** <br><br> **(San Francisco County <br> Super. Ct. No. SCN223684)** |

A jury convicted Jonathon M. Schneider of corporal injury on a cohabitant (Pen. Code, § 273.5, subd. (a)), three counts of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)), and false imprisonment by violence (Pen. Code, § 236).  The trial court suspended imposition of sentence and placed Schneider on probation.

Schneider appeals.  He contends the court erred by excluding cell phone videos depicting consensual sexual activity with the victim, and by denying his motion to reopen evidence to introduce the date and time of that sexual activity.  We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

Lea Walker met Schneider in 2011, when he came to San Francisco to visit his sister.  Walker and Schneider "hit it off" and were physically intimate; when Schneider returned to his home in Monterey, he and Walker texted.  After a few months, however,

1

they stopped communicating. In late 2014, Schneider visited San Francisco with his brother, David; they stayed at Walker's apartment.[1] Walker and Schneider rekindled their relationship and engaged in bondage. Schneider blindfolded Walker and tied her hands, but he never injured her. Schneider owned guns and stored them in a crate in Walker's living room.

By January 2015, the atmosphere in Walker's apartment was "tense" and "stressful[.]" Walker had lost her job, and Schneider was not paying rent, irritating Walker's roommate. Schneider and Walker argued about whether Schneider should move out of the apartment. Around this time, Walker began drinking "a lot more" and often drank to the point of intoxication. Schneider drank with Walker.

At noon on February 4, 2015, Walker began drinking Bloody Marys with Schneider, and they had sexual intercourse. Schneider blindfolded Walker and tied her hands and feet, but he did not hit or slap her. Walker and Schneider continued drinking throughout the day and by 7:30 p.m., Walker had consumed three or four "strong" Bloody Marys. As the day progressed, "things got more and more tense" and Walker and Schneider argued about "living situations[.]" Schneider told Walker he was going to move out of the apartment.

At 6:00 p.m., Walker was talking on the phone in the living room. Schneider was in the kitchen. Walker heard a loud crash and went into the kitchen, where she saw Schneider had knocked over a wooden butcher's block weighing 100 pounds. Broken glass was all over the floor and cookbooks, a crock pot, and a vase were scattered "everywhere." Walker asked Schneider, "[W]hat the hell happened?" and went to get a vacuum. Walker was angry, and might have suggested Schneider leave the apartment.

Suddenly, the argument became physical. Schneider forcefully slapped Walker's face and pushed her into a wall. They struggled on the dining room floor. Walker tried to twist her body away from Schneider, but he used his arm and the weight of his body to hold her down. Walker begged Schneider to stop and to release her, but Schneider

---

[1] We refer to family members by their first names for clarity and convenience. David left San Francisco after about a month.

refused and punched her in the stomach. Walker may have bitten Schneider during the struggle. Eventually, Walker broke free and called 911. Walker, however, was forced to end the 911 call when Schneider began struggling with her. At some point, Walker ran toward the living room and "screamed" for help out the living room window. A man across the street heard Walker's plea and called 911. Walker ran outside, where a police officer and paramedics were waiting.

San Francisco Police Officers Erik Ziegler and David Aschwanden arrived at Walker's apartment building. Officer Ziegler heard a woman — later identified as Walker — crying. Shortly thereafter, he saw Walker. She was crying and "visibly shaken[,]" but she was coherent and did not seem intoxicated. Walker had "bruising on her arm, and some bruising on her face. And she also had a little bit of fresh blood on her lips" and nostril. Walker told Officer Ziegler her boyfriend had "physically attacked her" and he had "guns in the house[.]" Officer Ziegler arrested Schneider and went inside the apartment, which appeared consistent with Walker's description of the incident.

Officer Aschwanden noticed swelling and bruising on Walker's face and head, consistent with "blunt force trauma[.]" Officer Aschwanden thought it possible Walker had "lost consciousness at some point and received some blows." The officers interviewed Schneider, who calmly told them "nothing physical had happened." Schneider seemed intoxicated and did not give direct answers to simple questions. Schneider showed the officers a split fingernail and red marks on his chest, which he described as bite marks.

Paramedics examined Walker and took her to the hospital. Walker felt "[s]wollen" and "awful." She had pain, bruising, and swelling all over her body, and a "big bump" on her head. She had a black eye and a cut on her lip. None of Walker's injuries were from consensual sex she had with Schneider that day. Walker did not know why Schneider attacked her.[2]

---

[2] On cross-examination, Walker estimated she engaged in bondage three to five times. On one occasion, Schneider playfully hit her with a kitchen spoon. Walker did not remember having sex after 5:30 p.m. on the day of the incident: she testified it was

3

E.Z. — the man who called 911 — heard a woman in a window on the second floor of a building crying and "screaming asking for help." She was "yelling and screaming for help" and saying "someone wanted to kill her." Her hair was "messed up[;]" she looked as though she "was suffering, and . . . may have been hit." There was blood under her nose. E.Z. moved closer to the window and heard a loud male voice say, "'Today, I'm going to kill you. . . . 'This is your day,' and he said he had a gun." The voice was "[v]ery angry." Then E.Z. heard the woman say, "'Don't do it'" and loud pounding noises. E.Z. called 911 and the police arrived quickly.

*Defense Evidence*

David testified he began staying at Walker's apartment in November 2014. David saw Walker slap Schneider during an argument, but he never saw Schneider act violently toward Walker. Walker and Schneider drank "regularly." In December 2014, David moved to Florida, but Schneider stayed at the apartment. On the evening of February 4, 2015 — between 9:00 and 11:00 p.m. eastern time — David received a phone call from Walker. Walker sounded "[n]ervous, anxious, worried."

Walker told David she and Schneider "had been drinking all day" and Schneider had "slapped the shit out of her. . . She said they had been drinking and . . . were getting into some . . . kinky activities, and . . . she asked him to slap her and he did, and he wasn't happy with it. So he left." Walker begged David to make Schneider come back to the apartment "because he was intoxicated, and [Walker] was concerned[.]" While David talked to Walker, Schneider called on the other line. David told Schneider not to go back to the apartment, and to sleep in his car. Some time later, Walker called David again and told him Schneider had been arrested. Walker said Schneider had "beat the shit out of her."

---

"earlier in the day" but could not recall the time. When Walker had consensual sexual intercourse with Schneider that day, she did not remember him saying, "good girl, I'm going to tie you up even more" nor Schneider telling Walker she "always ask[ed] for it[.]" She did not remember Schneider saying, "you just like the way things are, and you want me to do just whatever I can to your body" nor did she remember asking Schneider, "may I get tied up more[?]"

4

Schneider described his relationship with Walker. According to Schneider, Walker was physically and verbally abusive. She slapped Schneider, punched him, questioned his masculinity, yelled at him, and called him derogatory names. She also drank every day from November 2014 to January 2015. Walker and Schneider engaged in bondage five times: Walker asked Schneider to slap her and hit her with household items like a wooden spoon. The bondage was Walker's idea — she initiated it, and enjoyed it. Schneider complied with Walker's directions, but he was apprehensive about the bondage and often told her he was too uncomfortable to proceed.

In January 2015, Walker lost her job and began drinking heavily. Schneider considered ending the relationship because it was "toxic" and because Walker's behavior was "erratic" and controlling. On February 2, 2015, Schneider told his father that Walker had verbally berated and hit him. After Schneider woke up on February 4, 2015, he had sexual intercourse with Walker. At her request, Schneider made Bloody Marys and he and Walker drank them throughout the day. Walker and Schneider had sexual intercourse again around 2:00 p.m. By 6:00 p.m., Walker was inebriated and Schneider was "buzzed."

Walker and Schneider had sex a third time, around 6:00 p.m. She asked "to be tied up . . . and then she wanted to be hit." Schneider "acquiesced" and tied Walker's wrists and feet and blindfolded her. Walker asked Schneider "to hit her. Do whatever I want. She wanted to be slapped. To be slapped in the face. She wanted her hair pulled." Schneider used a wooden spoon, hangers, and a belt to hit Walker on her head, chest, shoulders, arms, chest, and thighs. He also slapped her in the face at least five times and pulled her hair. Walker told Schneider "how much she liked it" and "seemed to be pretty happy."

Walker asked Schneider to continue hitting her, but Schneider "was so uncomfortable" and told Walker he "couldn't continue." In response, Walker screamed and yelled at Schneider, questioning his manhood and sexuality. His feelings hurt, Schneider told Walker he was ending the relationship and moving to Arizona. Walker punched Schneider and he left the apartment. As he walked around the neighborhood,

5

Schneider called David, who told him not to return to the apartment. Against David's advice, Schneider returned to the apartment about 30 minutes later.

Schneider told Walker he was leaving in the morning. This upset Walker, and she yelled at Schneider and hit him. Walker ran into the kitchen, and then Schneider heard what "sounded like a kitchen island being turned over." In the kitchen, Schneider saw Walker crying, standing near the overturned island. Cookbooks, a crock pot, and broken ceramics were all over the floor. When Schneider hugged Walker to console her, she hit him and bit his chest. Schneider stepped away from Walker and she ran down the hall; as she ran, she tripped on a rug and fell. Schneider did not hit Walker, struggle with her, or threaten to kill her. Schneider did not know Walker had called 911. As he prepared to leave the apartment, the police arrived and arrested him.

On cross-examination, Schneider conceded the bump on Walker's forehead was not caused by consensual sexual intercourse.

*Verdict and Sentence*

A jury convicted Schneider of corporal injury on a cohabitant (Pen. Code, § 273.5, subd. (a)), three counts of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)), and false imprisonment by violence (Pen. Code, § 236). The court suspended imposition of sentence and placed Schneider on probation, with the condition he spend nine months in county jail.

DISCUSSION

Schneider contends the court erred by: (1) excluding evidence of cell phone videos depicting Schneider and Walker engaged in consensual bondage about an hour before Walker called 911; and (2) denying his motion to reopen evidence to introduce the date and time of that sexual activity.

6

# I.

## *Excluding the Cell Phone Videos Was Not an Abuse of Discretion and Any Assumed Error is Harmless*

### A.      Background

Before trial, Schneider moved in limine to introduce three short cell phone videos (videos) taken at 5:44 p.m., 5:49 p.m., and 6:10 p.m. on the day of the incident to "establish a mistake of fact defense." According to defense counsel, the videos show "Walker's hands are bound, and her eyes are covered with a blindfold." She asks Schneider "to do several sex acts with her[,]" to "'do what he wants[,]'" and "'to be tied up tighter.'" Defense counsel argued the videos demonstrated Schneider believed "Walker wanted to be slapped and struck during sexual foreplay" and that "the slapping that occurred was consensual[.]" The motion attached a transcript of the videos.

At an in limine hearing, defense counsel argued the videos explained Walker's injures and supported an inference "the injuries to her face came from consensual sexual foreplay." Defense counsel claimed the videos were "the heart of [Schneider's] defense . . . that this was consensual activity" and that the bruising on Walker's face was "part of what their sexual relations were about." The court tentatively concluded the videos could "come in as long as that foundation is laid, either through an expert or . . . by stipulation." The parties discussed foundational issues and the court noted "the People may need some more time to look at this, or perhaps have some things explained . . . let's see how that goes." Before Walker testified, however, the court indicated it would likely exclude the videos pursuant to Evidence Code section 352.[3]

On direct examination, Walker testified she and Schneider engaged in bondage: Schneider blindfolded Walker and tied her hands, but he never injured her. She also testified she did not ask Schneider to strike her in a way that injured her and that her injuries were not from consensual sexual activity with Schneider. On cross-examination, Walker estimated the bondage happened "three to five" times, and that Schneider hit her "in a playful manner . . . it would all be playful." Once, Schneider hit Walker with a

---

[3]      Unless noted, all further statutory references are to the Evidence Code.

7

"kitchen spoon" but never with a hanger. Walker never asked Schneider to slap her. When she and Schneider had consensual sexual intercourse on the day of the incident, Schneider tied Walker's hands and feet and blindfolded her at her request. Walker did not recall Schneider saying "good girl, I'm going to tie you up even more" nor him saying Walker "always ask[ed] for it."[4] She did not remember Schneider saying, "you just like the way things are, and you want me to do just whatever I can to your body." Walker did not recall asking Schneider, "may I get tied up more[?]" She explained she could not recall "everything I say when . . . having sex with somebody. I don't know the exact words I'm using." On redirect examination, Walker stated she never wanted Schneider to put her "in pain" when they were sexually intimate, and she never asked him to hurt her.

At a hearing outside the presence of the jury, defense counsel complained the court "hampered" Schneider's defense by excluding the videos and restricting his cross-examination "about the content of those videos[.]" In response, the prosecutor argued Walker was "unaware of whether any video recordings were taken of her and [Schneider] during their intimate sexual relationship on that day, and that a "secret videotape of her having intimate relations" violated her rights. The prosecutor claimed the videos had no probative value because they did depict "any violence. They show a consensual act. . . And [Walker] testified that she had previously on occasion engaged in this type of role playing intimacy in their relationship. . . . So there is no probative value at all." Finally, the prosecution argued the videos were highly prejudicial.

The court excluded the videos under section 352, determining it was not clear Walker "had agreed to the videotaping [or] . . . that the audio was done with her permission" and the videos: (1) were "not probative on the issue of whether prior injuries existed before the events in question[;]" (2) did not "show slapping or hitting[;]" and (3)

---

[4] During cross-examination, defense counsel "asked [Walker] questions that were taken from the transcript of the video[s] that would suggest that on that evening she was willing to engage in more than just being tied up." According to defense counsel, at an unreported sidebar conference the court told him he "wasn't allowed to ask" additional questions based on the transcript.

were "far more prejudicial than probative" because they were "embarrassing and certainly personal" and the information on the videos "could be provided by testimony and by other means." The court explained, "I did tell counsel that . . . the videos could be used for impeachment if, for example, there was something Ms. Walker testified that the blindfolding and being hand tied were never a part of her relationship with the defendant, that the video could be used for that impeachment purpose[ ]. [¶] Quite contrary she acknowledged that that was part of their relationship. I believe on the day in question that was . . . part of what occurred on that day[.]"

B.     Excluding the Videos Was Not an Abuse of Discretion

Only relevant evidence is admissible. (§ 350.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) "The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]" (*People v. Bivert* (2011) 52 Cal.4th 96, 116-117, quoting *People v. Garceau* (1993) 6 Cal.4th 140, 177.) The trial court has the discretionary power to exclude "evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) "The two crucial components of section 352 are 'discretion,' because the trial court's resolution of such matters is entitled to deference, and 'undue prejudice,' because the ultimate object of the section 352 weighing process is a fair trial." (*People v. Harris* (1998) 60 Cal.App.4th 727, 736.) The court's ruling on a section 352 objection "'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Schneider contends the court abused its discretion by refusing to allow him to impeach Walker with the videos. According to Schneider, the evidence was relevant to

impeach Walker's credibility and to support his theory that Walker was injured during consensual sexual activity. The court disagreed, concluding the videos were "not probative" in part because they did not "show slapping or hitting." That conclusion was not an abuse of discretion. On direct examination, Walker testified Schneider never injured her during bondage. She also testified she did not ask Schneider to strike her in an injurious manner and that her injuries were not from consensual sexual activity with Schneider. The videos were consistent with Walker's testimony.

Nor did the videos undermine Walker's credibility. "'The right of impeachment does not exist where the witness states he has no recollection of the fact concerning which he is examined.'" (*People v. Sam* (1969) 71 Cal.2d 194, 210, quoting *Sponduris v. Hasler* (1966) 246 Cal.App.2d 207, 214.) Walker testified she did not remember Schneider saying, "good girl, I'm going to tie you up even more" or "you just like the way things are, and you want me to do just whatever I can to your body." She also testified she did not remember Schneider telling her that she "always ask[ed] for it" or asking Schneider, "may I get tied up more[?]" Because Walker could not remember what was said when she and Schneider had consensual sexual intercourse on the day of the incident, there was no testimony to impeach. There is no indication Walker's failure to remember was a pretext; she explained she could not recall "exact words" spoken during sexual intercourse. (Cf. *People v. Green* (1971) 3 Cal.3d 981, 988, [impeachment permitted where witness's claimed lack of memory was evasive and "inherently incredible"], overruled on another ground in *People v. Chavez* (1980) 26 Cal.3d 334.)

Next, Schneider argues the court erred by excluding the videos under section 352. He concedes "the videos depicted intimate activities and were embarrassing" but claims the videos were not prejudicial under section 352. We are not persuaded. The trial court reasonably concluded the videos were "far more prejudicial than probative" because it was not clear Walker consented to being recorded, the videos were "embarrassing and certainly personal[,]" and the information on the videos "could be . . . provided by testimony and by other means." As discussed above, the videos were minimally probative, may have been recorded without Walker's consent, and depicted the "most

10

private human conduct, sexual behavior[.]" (See *Lawrence v. Texas* (2003) 539 U.S. 558, 567.) Under the circumstances, the court properly excluded them. (*Winifred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1014 [plaintiff's marital infidelity, and his "illicit, intimate conduct[,]" was "inflammatory" and should have been excluded under section 352]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [trial court "not required to admit evidence . . . 'that merely makes the victim of a crime look bad'"]; *People v. Phillips* (1985) 41 Cal.3d 29, 49 [evidence of witness's involvement in prostitution properly excluded because of "obvious potential for embarrassing or unfairly discrediting" the witness]; *People v. Hayes* (1992) 3 Cal.App.4th 1238, 1248 [same].)

The exclusion of the videos did not violate Schneider's right to present a defense. Defense counsel cross-examined Walker about her sexual activity on the day of the incident, and used the transcript of the videos to question Walker about statements she purportedly made to Schneider during that sexual activity. Schneider testified he and Walker had sexual intercourse three times on the day of the incident, including at 6 p.m., and he described the intercourse in detail. Finally, defense counsel argued to the jury that Walker's injuries were the result of consensual sexual intercourse and that Schneider "reasonably believed that Ms. Walker consented" to being slapped.

The court's exclusion of the videos pursuant to section 352 did not violate Schneider's right to present a defense. "Barring rare circumstances not present here, 'application of the ordinary rules of evidence under state law does not violate a criminal defendant's federal constitutional right to present a defense, because trial courts retain the intrinsic power under state law to exercise discretion to control the admission of evidence at trial.' [Citations.]" (*People v. Andrade* (2015) 238 Cal.App.4th 1274, 1290; *People v. Riccardi* (2012) 54 Cal.4th 758, 809 [rejecting defendant's various constitutional claims "in the absence of any error under . . . section 352"], overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192.)

C.    Any Assumed Error in Excluding the Videos Is Harmless

Even if we assume the court erred by excluding the videos, any error is harmless because it is not reasonably probable Schneider would have received a more favorable

result had the court admitted them. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) As we have discussed, the videos did not show violence, did not support Schneider's claim that Walker's injuries occurred during consensual sexual activity, and did not impeach Walker. The prosecution evidence demonstrated Schneider assaulted Walker in the kitchen and dining room —not during consensual sexual intercourse. Walker testified Schneider slapped her in the face, held her down with the weight of his arm, punched her in the stomach, and slammed her head against the wall. She also testified these injuries did not occur during consensual sexual intercourse with Schneider, and Schneider conceded the bump on Walker's forehead did not occur during consensual sexual activity. Walker's extensive injuries — bruising on her face, and torso, the large bump on her forehead, and bloody cut on her lip — were consistent with being assaulted.

Other prosecution evidence corroborated Walker's description of the incident. For example, E.Z. heard Walker crying and screaming for help, saying "someone wanted to kill her." She was disheveled and looked like she "was suffering, and . . . may have been hit." E.Z. saw blood under Walker's nose and heard loud pounding noises coming from the apartment. Officer Ziegler found Walker crying and "visibly shaken[,]" and saw bruising and "fresh blood" on her face. Officer Aschwanden noticed swelling and bruising on Walker's face and head, consistent with "blunt force trauma" or receiving "some blows." Finally, the physical evidence at the apartment — the overturned kitchen island and broken items scattered on the floor — corroborated Walker's version of the events. Under the circumstances, Schneider was not prejudiced by the exclusion of the videos.

## II.

### *Denying the Request to Reopen Was Not an Abuse of Discretion*

Schneider contends the court abused its discretion and violated his constitutional rights by denying his "request to reopen the trial and to admit" the date and time of the videos.

During closing argument, the prosecutor stated Walker and Schneider had consensual sexual intercourse early in the day on February 4, 2015, and that Walker's

12

injuries were fresh when the police arrived and could not have been caused during that sexual activity. After the prosecutor finished her closing, defense counsel moved to reopen evidence to introduce the date and time of the videos. Defense counsel argued the date and time of the videos "show that intimacy took place later in the day" and supported Schneider's testimony that Walker's injuries "could have occurred [during] consensual activity." The court denied the request, concluding the videos were inadmissible under section 352.

"In determining whether a trial court has abused its discretion in denying a defense request to reopen, the reviewing court considers the following factors: '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.' [Citation.]" (*People v. Jones* (2003) 30 Cal.4th 1084, 1110, quoting *People v. Funes* (1994) 23 Cal.App.4th 1506, 1520.) Here, the court did not abuse its discretion by denying Schneider's request to reopen because the evidence had little significance. The timing of the videos would not have assisted Schneider because they did not depict violence. In other words, the jury could have concluded consensual sexual activity occurred approximately one hour before Walker called 911 *and* that Schneider assaulted Walker after that sexual activity. Under the circumstances, the court did not abuse its discretion by denying Schneider's request to reopen. (See *Charles C. Chapman Building Co. v. California Mart* (1969) 2 Cal.App.3d 846, 859.) We reject Schneider's claim that the denial of his request to reopen violated his federal constitutional rights.

## DISPOSITION

The judgment is affirmed.

13

                                             _____

                                             Jones, P.J.

We concur:

_____

Simons, J.

_____

Needham, J.